**LOGAN LUMBER COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 22390.

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1966.

Michel G. Emmanuel, Norman H. Lipoff, Tampa, Fla., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Mitchell Rogovin, Chf. Counsel, Richard P. Milloy, Atty., I.R.S., Washington, D. C., Richard M. Roberts, Act. Asst. Atty. Gen., Thomas Silk, Meyer Rothwacks, Gilbert E. Andrews, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before PHILLIPS,* RIVES and COLEMAN, Circuit Judges.

RIVES, Circuit Judge:

This is an appeal by the Logan Lumber Company from an adverse ruling by the Tax Court. The Tax Court held that the Logan Lumber Company [1] had under-reported its corporate income for the fiscal years ending June 30, 1951 to 1960, inclusive. The assessment of a delinquency penalty for the late filing of taxpayer's 1952 corporate tax return was also upheld by the Tax Court.[2]

---

* Of the Tenth Circuit, sitting by designation.

1. Hereafter taxpayer or Lumber Co.

2. This case is not officially reported.

Logan Lumber Company was organized in 1935 by W. W. Logan, Sr., and at all times here relevant its stock was owned 100% by members of the Logan family. This appeal presents six issues: 1) Did petitioner deduct excessive salaries for both Mr. and Mrs. W. W. Logan, Sr.? 2) Did petitioner deduct excessive rent for premises leased from another wholly-owned corporation? 3) Did petitioner fail to timely file its 1952 tax return without just cause? 4) Did petitioner miscompute its 1952 closing inventory? 5) Did petitioner misconstrue an earlier tax settlement? 6) Does the Supreme Court's decision in Commissioner v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966), require remand of this case for further proceedings?

I.

The Internal Revenue Code of 1939 [3] and 1954 [4] allows a corporation to deduct from its gross income "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade of business." These expenses include "a reasonable allowance for salaries or other compensation for personal services actually rendered."

In its returns for 1944 through 1960, taxpayer deducted the following salary paid to W. W. Logan, Sr.:

| Year | Salary | Year | Salary |
|------|--------|------|--------|
| 1944 | $24,000.00 | 1953 | $50,000.00 |
| 1945 | 24,000.00 | 1954 | 48,000.00 |
| 1946 | 24,000.00 | 1955 | 48,000.00 |
| 1947 | 36,000.00 | 1956 | 48,000.00 |
| 1948 | 36,000.00 | 1957 | 42,000.00 |
| 1949 | 60,000.00 | 1958 | 24,000.00 |
| 1950 | 60,000.00 | 1959 | 21,000.00 |
| 1951 | 72,000.00 | 1960 | 18,000.00 |
| 1952 | 72,000.00 | | |

Taxpayer also deducted the following salary paid to Mrs. W. W. Logan, Sr.:

| Year | Salary | Year | Salary |
|------|--------|------|--------|
| 1953 | $9,000.00 | 1957 | $9,000.00 |
| 1954 | 9,000.00 | 1958 | 6,000.00 |
| 1955 | 9,000.00 | 1959 | 3,600.00 |
| 1956 | 9,000.00 | 1960 | 1,200.00[5] |

The Commissioner challenged the reasonableness of the salaries paid to W. W. Logan, Sr. in 1951 and 1952 and to Mrs. W. W. Logan, Sr. from 1953 through 1960. The Tax Court held that a reasonable salary for W. W. Logan, Sr. in 1951 and 1952 would not exceed $50,000. Therefore, $22,000 of the salary to W. W.

---

3. Section 23 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23 (1952 ed.).

4. Section 162 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162 (1958 ed.).

5. While taxpayer paid a salary to Mrs. Logan in prior years, on the advice of its former accountant no deduction was taken during those years for Mrs. Logan's salary.

Logan, Sr. was disallowed as a deduction for each of those years. In addition, the Tax Court allowed a deduction of $1,800 per year for salary paid to Mrs. W. W. Logan, Sr. from 1953 to 1956, but nothing thereafter.

The Logan Lumber Company is a closely-held corporation with Logan, Sr., his wife, their children and grandchildren owning all of the stock.[6] Other salaried officers were Logan, Sr.'s two sons, W. W. Logan, Jr. and Donald A. Logan.[7]

Throughout its corporate history, taxpayer has never declared or paid a cash dividend. It had the following earned surplus and undivided profits:

| Year Ended June 30 | Amount |
| --- | --- |
| 1951 | $554,700.00 |
| 1952 | 518,066.00 |
| 1953 | 472,903.00 |
| 1954 | 429,917.00 |
| 1955 | 483,094.00* |
| 1956 | 425,421.00* |
| 1957 | 444,266.00* |
| 1958 | 359,219.00* |
| 1959 | 382,920.00* |
| 1960 | 339,079.00* |

6.

| | July 1, 1950 to Dec. 1, 1951 | Dec. 22, 1951 to Dec. 23, 1952 | Dec. 24, 1952 to Dec. 16, 1954 | Dec. 16, 1954 to June 30, 1960 |
| --- | --- | --- | --- | --- |
| W. W. Logan, Sr. | 60% | 56% | 51.5% | 50.42% |
| Mattie R. Logan | 20% | 16% | 11.5% | 2.96% |
| W. W. Logan, Jr. | 10% | 11% | 12% | 13.07% |
| Sara B. Logan (wife of W. W. Logan, Jr.) | | 1% | 2% | 3.07% |
| Lamar Logan (son of W. W. Logan, Jr.) | | 1% | 2% | 3.07% |
| Allen Logan (son of W. W. Logan, Jr.) | | 1% | 2% | 3.07% |
| Donald A. Logan | 10% | 11% | 12% | 13.07% |
| Mary H. Logan (wife of Donald) | | 1% | 2% | 3.07% |
| Nancy Sue Logan (daughter of Donald) | | 1% | 2% | 3.07% |
| Kathryn Joan Logan (daughter of Donald) | | | 1% | 3.06% |
| Donald J. Logan (son of Donald) | | 1% | 2% | 3.07% |
| | 100% | 100% | 100% | 100.00% |

◆

| Year | W. W. Logan, Jr. | Donald A. Logan |
| --- | --- | --- |
| 1951 | $30,000.00 | $24,000.00 |
| 1952 | 30,000.00 | 24,000.00 |
| 1953 | 38,250.00 | 37,750.00 |
| 1954 | 39,000.00 | 39,000.00 |
| 1955 | 39,000.00 | 39,000.00 |
| 1956 | 39,000.00 | 39,000.00 |
| 1957 | 37,500.00 | 19,500.00 |
| 1958 | 24,000.00 | —0— |
| 1959 | 27,000.00 | —0— |
| 1960 | 30,000.00 | —0— |

Donald Logan left Lumber Co.'s employ in 1957.

◆

* Petitioner's conversion of $200,000.00 from surplus to capital by means of a stock dividend has been disregarded in the above table.

Moreover, taxpayer's sales and net income after deducting the salaries paid to officers was as follows:

| Year | Sales | Net Income | |
|------|-------|-----------|---|
| 1951 | $3,773,598.00 | $258,849.00 | |
| 1952 | 3,217,889.00 | 51,916.00 | (loss) |
| 1953 | 3,352,680.00 | 43,816.00 | (loss) |
| 1954 | 2,933,504.00 | 42,629.00 | (loss) |
| 1955 | 3,799,542.00 | 57,636.00 | |
| 1956 | 4,176,514.00 | 47,975.00 | (loss) |
| 1957 | 4,361,845.00 | 19,990.00 | |
| 1958 | 3,911,843.00 | 59,632.00 | (loss) |
| 1959 | 2,872,156.00 | 23,242.00 | |
| 1960 | 3,045,153.00 | 42,367.00 | (loss) |

The questions we must decide are whether the Tax Court's factual findings as to W. W. Logan, Sr.'s salary and his wife's salary are clearly erroneous in view of all of the evidence in this record. San Marco Shop, Inc. v. Commissioner of Internal Revenue, 223 F.2d 702 (5 Cir. 1955); Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 192 F.2d 633 (5 Cir. 1951), cert. den., 343 U.S. 941, 72 S.Ct. 1033, 96 L.Ed. 1347 (1952); Stein v. Commissioner of Internal Revenue, 322 F.2d 78 (5 Cir. 1963); Golden Const. Co. v. Commissioner of Internal Revenue, 228 F.2d 637 (10 Cir. 1955); Oswald Co., Inc. v. Commissioner of Internal Revenue, 185 F.2d 6 (7 Cir. 1950).

The Logan Lumber Company is a wholesaler and jobber for lumber and related materials. It maintains warehouses and a lumber yard in Tampa, Florida. In 1935 a wholesale warehouse was opened in Miami, Florida, which later expanded to include a wholesale lumber yard. The Miami branch was closed in 1958.

W. W. Logan, Sr. was 63 and 64 years of age, respectively, during the fiscal years of 1951 and 1952. Ample evidence supports the Tax Court's finding that "he worked long hours during the weekdays and picked up the mail twice on Sundays" when he was in Tampa during this time. W. W. Logan, Sr. was away from Tampa 113 days during 1951 and 124 days during 1952, and while he was away W. W. Logan, Jr. was in charge of the company's operation. In August 1952, W. W. Logan, Jr. became the president and chief executive officer of taxpayer.

During 1950–1951, W. W. Logan, Sr. was president of the National Plywood Distributors Association and served as a director in other years. He was also a director of the National American Wholesale Lumber Association.

Byron Harless, a senior partner in a nationally known firm of industrial psychologists, which had done work for taxpayer beginning in 1951, testified as taxpayer's expert on compensation. Mr. Harless testified that his firm was "frequently" called upon to recommend salaries for executive personnel. In recommending compensation, they take into account "the size of the organization," "the number of people * * * supervised," "the financial responsibilities of the job," and "the community or area in which the company is involved." When possible they also take into account the salary paid to executives filling comparable jobs. "The principal thing is * * * the magnitude of the responsibilities the man has on him."

Mr. Harless had made no study of firms in the lumber industry other than Logan Lumber Company. Although he

had placed [8] men within numerous large businesses and governmental organizations, he recalled placing or evaluating no executives with compensation ranging above $35,000 per year. Based on the "responsibilities" entailed in W. W. Logan, Sr.'s position during 1951 and 1952, Mr. Harless testified a proper salary would range from $50,000 to $100,000.[9]

Mr. Harless also testified that at these top levels of management there is executive mobility between different industries and different "phase[s]" within the same industry, such as wholesaling and retailing. In Florida, salaries within the same industry would be lower in Tampa generally than in Miami, according to Mr. Harless.

As its expert, the Commissioner offered the testimony of Lucien Renuart, Vice President of the Renuart-Bailey-Cheely Lumber and Supply Company in Miami, Florida. Mr. Renuart had been in the lumber business for 40 years and had been Vice President of Renuart-Bailey-Cheely or its predecessor for 20 years.

During 1950 to 1960, Mr. Renuart's firm had sales of from 3 to 5 million dollars. He testified that he believed adequate compensation for the president of a lumber firm of this size would be $28,000. His firm also paid substantial dividends.

■ When we deal with a closed family corporation paying substantial amounts as salaries to the family members,[10] special scrutiny must be given to such salaries because of the lack of arm's length bargaining over compensation. Whether these salaries represent reasonable allowances for services actually rendered or are in part a distribution of profits or accumulated earnings in the guise of salaries is a question which must be determined in view of all of the evidence in the record.

■ Mr. Harless testified that $50,000 would be reasonable compensation for W. W. Logan, Sr., even though he would not consider amounts up to $100,000 unreasonable.[11] While the qualifications of this expert are impressive, a number of factors derogate from the value of his estimate of a reasonable salary for W. W. Logan, Sr. The witness lacked familiarity with the lumber industry and generally dealt with executives with compensation not exceeding $35,000. When this is coupled with the dividend and earnings record of taxpayer and is compared to the testimony of Mr. Renuart, the $50,000 allowance by the Tax Court cannot be said to be clearly erroneous. Cf. Commercial Iron Works v. Commissioner of Internal Revenue, 166 F.2d 221 (5 Cir. 1948).

The same conclusion as to the Tax Court's findings with relation to Mrs. W. W. Logan, Sr.'s salary is compelled by this record. Mr. Harless made no evaluation of Mrs. Logan's position or salary.

■ Mrs. Logan's services were mainly in the nature of assistant to her husband. On occasions she answered the telephone and relayed messages to him. Typing with two fingers, she did some typing for him. On the record we think

---

8. Mr. Harless' firm did not actually recruit executives but evaluated executives already in the employ of their clients to determine whether they should be promoted to higher echelon jobs and what would be appropriate compensation for those jobs.

9. While Mr. Harless considered W. W. Logan, Sr. "pretty hard-headed and stubborn," he also thought that W. W. Logan, Sr. was "an aggressive and an alert individual" who compared "very favorably with" executives operating similar or larger businesses.

10. In the years 1951 and 1952, Lumber Co. paid over $125,000 per year to members of the Logan family as salaries.

11. Mr. Harless also testified that as a "rule of thumb" a "differential" of 30% should be maintained between the salaries paid to top management officials. Taking W. W. Logan, Jr.'s $30,000 per year salary as a base, and keeping in mind the fact that he actually acted as chief executive officer of Lumber Co. for at least 1/3 of 1951 and 1952, a fair compensation for W. W. Logan, Sr. would be $45,000 per year.

the Tax Court was generous in allowing $1,800 for her services between 1953 and 1956.

In July of 1952, W. W. Logan, Sr. had a cancerous kidney removed and never returned to a fully active status. Mrs. Logan continued to assist her husband. As to services beyond 1956, the Tax Court was unconvinced that a deduction for salary was justified as to Mrs. W. W. Logan, Sr. We fully agree and affirm its determination as not being clearly erroneous.

## II.

Lumber Co. leased its Tampa premises from the Rome Avenue Corporation. Originally W. W. Logan, Sr. and his wife owned the property on which Logan Lumber Company conducted its Tampa operations. In 1945 they created a corporation, Rome, to which they conveyed this property. Thereafter, taxpayer leased this property from Rome. Rome, at all times pertinent here, was owned by Mr. and Mrs. W. W. Logan, Sr. and their two sons.

Taxpayer deducted the following amounts as rent on its tax return: [12] In 1951, $24,300; in 1952, $26,700; and in 1953 through 1960, $34,200 per year. The Tax Court held that in an arm's length transaction a proper rent for the fiscal years ending June 30 would be as follows: 1951, $19,150; 1952, $22,500; and 1953 through 1960, $26,820 per year.[13]

The taxpayer agrees that "because of the close relationship between the lessor and the lessee an inquiry should be made into the fair rent of the premises occupied by taxpayer, with a view toward determining 'what petitioner [taxpayer] would have been required to pay had it dealt at arms length with a stranger.' J. J. Kirk, Inc., 34 T.C. 130, 137 (1960), aff'd, 289 F.2d 935 (6 Cir. 1961)." But in this case taxpayer argues the Tax Court was clearly erroneous in its finding of a fair rental.

Taxpayer had two experts testify on a fair rental. The Commissioner relied on all of the evidence in the record, including the cross-examination of taxpayer's experts, but called no expert of its own.

These experts testified as to three different ways to compute a fair rental. One method was based on the fair rental value per square foot, which taxpayer's expert prepared "based" on "rents in the Tampa area compared" to Lumber Co.'s facilities. Using this system, a "minimum rental" of $26,800 would be reasonable for the years after 1953.[14] It was this testimony on which the Tax Court relied.

■ Since its experts were uncontradicted, taxpayer argues that the Tax Court must adopt the higher rentals to which its experts also testified. One of its experts testified the best means of computing the rent was a percentage-of-sales method. But we do not think that, as a matter of law, the Tax Court was required to adopt only that method which taxpayer's experts characterized as the "best" method.

■ In Burford-Toothaker Tractor Co. v. Commissioner, 192 F.2d 633 (5 Cir. 1951), the petitioner called four witnesses who gave their opinions and the Commissioner called none. This Court said (192 F.2d at 635):

"In the present case in addition to the opinions of witnesses there was factual evidence from which reasonable inferences could be drawn. * * *

\*    \*    \*    \*    \*    \*

"The Tax Court was not concluded by the opinions of the witnesses."

We think the rule is clear, the Tax Court is not bound by the conclusory state-

---

12. Section 23, 26 U.S.C.A. § 23 (1952 ed.) and section 162, 26 U.S.C.A. § 162 (1958 ed.) allow a taxpayer to deduct "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the tax-

payer has not taken or is not taking title or in which he has no equity."

13. These figures have been adjusted by the Tax Court to reflect improvements added during the years under consideration.

14. See note 13, and accompanying text.

ments of any witness, even an "expert." The Court must look at the substance of a witness' testimony as well as his conclusions. The testimony must be weighed along with all other relevant evidence. The percentage-of-sales method adopted by the experts measures only the ability of the lessee to pay and not necessarily the fair market rental value of the property.[15]

As a result of the nature of taxpayer's business, many of its sales were made through its Miami outlet or directly from supplier to buyer with taxpayer acting as the middle man. It cannot be said that taxpayer's sales would necessarily be an accurate reflection of the rental value of the Tampa properties.

█ The Tax Court adopted the method testified to by the experts which it believed to best reflect an accurate means of computing a rental based on the character of the business here involved. Based on the record in this case, we conclude that the findings of the Tax Court were not clearly erroneous and must be affirmed.

### III.

For failure to timely file a tax return, the Internal Revenue Code imposes a penalty not in excess of 25% of the tax due.[16] This penalty may be avoided if the taxpayer can show that its failure to file was due to reasonable cause. Stated alternatively, the taxpayer must show his failure to file was not due to willful neglect. Breland v. United States, 323 F.2d 492 (5 Cir. 1963); Home Builders Lumber Co. v. Commissioner, 165 F.2d 1009 (5 Cir. 1948).

In the instant case, the Tax Court found that Lumber Co.'s failure to file its 1952 tax return on time was not due to reasonable cause. Lumber Co. advances two reasons for its failure to timely file its return.

The first reason is that Logan, Jr. became president of taxpayer just after the close of its 1952 fiscal year. Lumber Co. argues that, as a result of the confusion surrounding this executive transition, its failure to file is understandable.

The second reason advanced is that taxpayer relied on its certified public accountant to make out and file its returns. The accountant's failure, it is argued, constitutes reasonable cause for Lumber Co.'s failure to file.

The Tax Court found that Lumber Co.'s return was due on September 15, 1952, one month after W. W. Logan, Jr. took office, and that "W. W. Logan, Jr. testified that he delivered corporate records to the accountant who prepared petitioner's income tax returns in ample time to file the 1952 return before the deadline." It was also held by the Tax Court "that there is no convincing evidence that it [Lumber Co.] relied upon him [the accountant] to file its returns or that he was responsible for the late filing." Previous returns had been signed by D. A. Logan as treasurer of Lumber Co. and a "Tentative Return" was signed on September 13, 1952, two days before the due date, by W. W. Logan, Jr. The Tax Court held that the "Tentative Return" was "certainly some indication that" W. W. Logan, Jr. was aware that a return was due on September 15, 1952.

█ Forgetting to file a tax return or failing through inadvertence to see that it is filed does not constitute reasonable cause.[17] Rogers Hornsby, 26 F. T.A. 591; Charles C. Rice, 14 T.C. 503, at 509 (1950); George R. Joslyn, 23 T.C. 126 (1955); Veterans Foundation, 38 T.C. 66, at 75 (1962). See Mertens Law of Fed. Inc. Tax., Vol. 10, § 55.23.

---

15. The percentage-of-sales method would be more applicable to rents charged by shopping centers or businesses whose locations play an important role in determining the amount of their sales.

16. Section 291, 26 U.S.C.A. § 291 (1952 ed.).

17. In Lee v. Commissioner of Internal Revenue, 227 F.2d 181, at 184 (5 Cir. 1955) at 184, we held that section 291 does not require that the taxpayer's failure to file be deliberate; rather the statute imposes upon the taxpayer the burden of showing reasonable cause that prevented the timely filing.

■ In our opinion, Lumber Co. is no better off even if it relied on its accountant to prepare its returns. The negligent failure of an accountant or lawyer to prepare taxpayer's return is not reasonable cause for a failure to timely file. James Phelan, T.C. Memo 1959–53; Home Guaranty Abstract Co. v. Commissioner, 8 T.C. 617, at 622 (1947); Burton Swartz Land Corp. v. Commissioner, 198 F.2d 558, at 560 (5 Cir. 1952) (dicta); see Mertens Law of Fed. Inc. Tax., Vol. 10, § 55.23. Cf. Robinson's Dairy v. Commissioner, 302 F.2d 42, at 45 (10 Cir. 1962).

The federal tax statute has "placed the responsibility for filing [of a] return on time squarely upon each and every taxpayer." Charles C. Rice, 14 T.C. 503 (1950), at 509. If every taxpayer who forgot to file a return or was too busy to file a return escaped the penalty for failure to file, our tax system would soon collapse.[18] In view of the evidence in the record, we cannot say the Tax Court's holding was clearly erroneous.

## IV.

■ The question of whether taxpayer altered its usual accounting procedure and thereby misstated its closing inventory was purely a fact question. The record amply supports the finding of the Tax Court.

## V.

Taxpayer argues that a previous settlement of an unrelated tax dispute between it and the Commissioner was a point-by-point settlement. The Commissioner argues that it was a lump-sum settlement, and that taxpayer cannot use it to predicate the arguments for certain tax computations involved in this case. We cannot say the Tax Court's conclusion that the previous settlement was a lump-sum settlement was clearly erroneous.

## VI.

Subsequent to the argument of this case, the Supreme Court decided Commissioner of Internal Revenue v. Tellier, 383 U.S. 687 (1966), 86 S.Ct. 1118, 16 L.Ed.2d 185. In *Tellier* the Supreme Court held that legal fees paid for defending criminal charges arising out of the conduct of taxpayer's business activities are generally deductible as ordinary and necessary business expenses.[19]

At the time the instant case came before the Tax Court, the law seemed settled to the contrary, and litigation expenses in the unsuccessful defense of criminal charges were not considered deductible. In Henry L. Peckham, 40 T.C. 315, at 317 (1963), the Tax Court said:

"We have held in a number of cases that the legal expenses incurred in the unsuccessful defense of a criminal prosecution are not deductible. * * *

* * * * * *

"Until the cases holding legal expenses paid in the unsuccessful defense of criminal prosecutions are not deductible 'are unequivocally overruled we are constrained to follow them.' "

Thus, until *Tellier* was decided by the Supreme Court, the Tax Court stuck tenaciously to its view that the deduction of legal expenses incurred in the defense of a criminal prosecution *where the defendant was not exonerated* would violate public policy and must be denied. See Thomas A. Joseph, 26 T.C. 562 (1956) and cases there cited. See also Walter F. Teller, 22 CCH Tax Ct.Mem. 1062 (1963).

It was only natural, under this state of the law, that the present taxpayer would stipulate what its legal and accounting expenses were and agree these

---

18. "That the failure was due to inadvertence does not relieve the petitioner from the imposition of the penalty. The penalty is not primarily punitive in nature, but is an attempt to protect the revenue." Plunkett v. Commissioner of Internal Revenue, 118 F.2d 644, at 650 (1 Cir. 1941), at 650.

19. As a result of the *Tellier* opinion, all legal fees for the defense of criminal charges incurred in a trade or business context became deductible, regardless of whether the litigant lost, compromised or succeeded.

were not deductible. In Brast v. Winding Gulf Colliery Co., 94 F.2d 179 (4 Cir. 1938), the Fourth Circuit dealt with precisely this same problem of a stipulation entered under a mistake of law.

In *Brast* the taxpayer had deducted "certain items for plant equipment and structures which the" Commissioner disallowed. While the case was pending before the Board of Tax Appeals, that body decided "the same question, involved in the petition of the plaintiff [taxpayer], in two [other] cases" contrary to taxpayer's position. Taxpayer therefore entered into a "stipulation" conceding the taxes. Following the stipulation, the Board entered an order from which no appeal was taken.

Subsequently, the Fourth Circuit in an unrelated case decided the same legal issue against the Commissioner, reversing the Board. Taxpayer then sought unsuccessfully to have the Commissioner set aside its stipulation and refund the erroneously paid taxes. A refund suit in the district court was instituted by the taxpayer. The district court held for the taxpayer, and the Fourth Circuit affirmed. That Court said (94 F.2d 179, at 181–82):

> "The plaintiff by the stipulation merely agreed to pay what it was not, under the law as finally determined, required to pay, and, when it discovered its mistake, had the unquestioned right to ask that it be relieved.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "The trial court in the exercise of what we hold to be a sound discretion, and in the furtherance of justice, relieved the plaintiff from the stipulation. By this action the government suffered no prejudice. It was only required to refund the sum it had collected, which it had no right to collect."

Where a stipulation is entered into under a mistake of law induced by the then existing state of the case law, a taxpayer is entitled to be relieved of the effect of that stipulation if no prejudice results. See George S. Colton Elastic Web Co. v. White, 23 F.Supp. 761 (D. Mass.1938). This Circuit has held that a party may be relieved of a stipulation "to prevent manifest injustice" so long as "suitable protective terms or conditions are imposed to prevent substantial and real harm to the adversary." Laird v. Air Carrier Engine Service, 263 F.2d 948, at 953 (5 Cir. 1959); Mitchell v. C. & P. Shoe Corp., 286 F.2d 109, at 114 (5 Cir. 1960). Cf. Curtis Publishing Co. v. Butts, 351 F.2d 702, at 720, 733–739 (5 Cir. 1965), (dissenting opinion); Commissioner of Internal Revenue v. Chase Manhattan Bank, 259 F.2d 231, at 237–238 (5 Cir. 1958), cert. den., 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575. Also cf. Hormel v. Helvering, 312 U.S. 552 (1941); Tomlinson v. Commissioner of Internal Revenue, 182 F.2d 938 (5 Cir. 1950); Bodden v. Commissioner of Internal Revenue, 182 F.2d 624 (5 Cir. 1950); Seabrook v. Commissioner of Internal Revenue, 176 F.2d 605 (5 Cir. 1949).

It is, therefore, appropriate for us to remand this case to the Tax Court for further proceedings not inconsistent with this opinion and the opinion of the Supreme Court in Commissioner v. Tellier, 383 U.S. 687 (1966), 86 S.Ct. 1118, 16 L.Ed.2d 185, limited to the issue of deduction for legal and auditing expenses incurred in the defense of a criminal prosecution. Subject to such proceedings and any appropriate order or orders thereafter entered, the decision of the Tax Court is affirmed.

Affirmed and remanded.