COLDWATER SEAFOOD CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8244–74.     Filed March 21, 1978.

*Leo A. Diamond, Peter F. Edelman, Robert N. Solomon,* and *Philip Zimet,* for the petitioner.
*Stanley J. Goldberg* and *Alan J. Garfunkel,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioner's withholding tax and additions to tax

under section 6651(a):[1]

| Year | Deficiency | Addition (sec. 6651(a)) |
|---|---|---|
| 1963 | $65,641 | $16,410 |
| 1964 | 69,096 | 17,274 |
| 1965 | 55,579 | 13,894 |
| 1966 | 60,839 | 15,209 |
| 1967 | 72,744 | 18,186 |
| 1968 | 70,324 | 17,581 |
| 1969 | 21,546 | 0 |
| Total | 415,769 | 98,554 |

The issues for decision are as follows:

1. Whether certain quarterly payments made by petitioner to the Association of Icelandic Freezing Plants during 1963 through 1969 were interest paid to a foreign corporation and thus subject to income tax withholding at a rate of 30 percent pursuant to sections 1441 and 1442.

2. Whether petitioner's failure to file United States Annual Returns for Income Tax to be Paid at Source, Forms 1042, for 1963 through 1968, was due to its willful neglect and not due to reasonable cause within the meaning of section 6651(a).

### FINDINGS OF FACT

Coldwater Seafood Corp. (hereinafter referred to as petitioner) was a corporation organized under the laws of the State of New York. When it filed its petition, its principal offices were in Scarsdale, N. Y. Petitioner filed its Federal income tax returns for 1963 through 1968 with the District Director of Internal Revenue, Manhattan District, N. Y., and for 1969 with the Internal Revenue Service Center, Andover, Mass. For 1963 through 1968, petitioner failed to file Form 1042, United States Annual Return of Income Tax to be Paid at Source. Petitioner filed a Form 1042 for 1969, but did not report as interest the payments here in dispute.

Petitioner is a wholly owned subsidiary of Solumidstod Hradfrystihusanna (Association of Icelandic Freezing Plants,

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.

hereinafter Icelandic), a cooperative association organized under the laws of Iceland. Icelandic's members are freezing plant operators which catch, fillet, and freeze fish. Icelandic sells its members' frozen food products, mainly in the international market, and purchases essential supplies for them. All of Icelandic's sales in the United States are made to petitioner.

Prior to January 1, 1963, petitioner sold seafood as Icelandic's commission agent. During the years in issue, however, petitioner bought seafood from Icelandic and resold it. Icelandic was not directly engaged in a United States trade or business.

The pre–1963 arrangement between Icelandic and petitioner became unacceptable to Icelandic and its members because there was a long delay, sometimes as much as 12 months, between Icelandic's shipments to the United States and its receipt of payment therefor. Yet the freezing plant operators needed to be paid promptly for their fish. In contrast, Icelandic was usually able to collect accounts from unrelated importers in other countries through such arrangements as letters of credit or cash against documents within 10 days of the shipment.

In order to remedy this situation, Icelandic advised petitioner's management that, after January 1, 1963, it would be necessary for petitioner to make arrangements to pay for the seafood it received on terms and conditions similar to those on which Icelandic dealt with unrelated importers in other countries. Petitioner's management was advised further that if arrangements could not be made for Icelandic to be paid more promptly, petitioner would be sold or dissolved. Petitioner, however, did not have enough operating capital to make immediate payment for Icelandic's seafood, either by letters of credit or cash against documents. Moreover, petitioner, alone, did not have sufficient capital to support credit arrangements to the extent needed to cover the purchases.

In 1963, Icelandic entered into a financial arrangement with Landsbanki Islands (also known as the National Bank of Iceland, hereinafter NBI), the Export-Import Bank of Washington, D. C., and the First National City Bank of New York (Citibank). Under this arrangement, NBI established a line of credit with Citibank, and Citibank honored drafts drawn on it by NBI based on shipping documents. The Export-Import Bank agreed to guarantee payment of 50 percent of each draft issued to NBI and accepted by Citibank under the credit line in a total amount

not to exceed $4 million at any one time. All drafts drawn by NBI on Citibank under this arrangement were to mature within 180 days.

Pursuant to this arrangement, most of Icelandic's sales to petitioner were structured as follows:

1. On shipment of the seafood to petitioner, Icelandic would present the shipping documents to NBI, and NBI would draw upon Citibank a draft payable to itself in an amount not exceeding 85 percent of the invoice price of the shipment. Such invoice price reflected the prevailing price of the seafood at the point of delivery.

2. Upon acceptance of the draft, Citibank would credit NBI's account with the amount thereof less certain discounts and commissions as follows:

(a) Citibank would discount the draft at the prevailing rate for bankers' acceptances, based on the number of days until maturity. The average unregulated prorated discount rates on 180-day bankers' acceptances for New York City and regional banks, including Citibank, were as follows:

| Year | Average rate (percent) | Year | Average rate (percent) |
|------|------------------------|------|------------------------|
| 1963 | 3.688 | 1966 | 5.521 |
| 1964 | 4.042 | 1967 | 4.948 |
| 1965 | 4.531 | 1968 | 5.885 |

The discount rates for bankers' acceptances with maturities less than 180 days each year was less than these percentages.

(b) Citibank would deduct, for transmittal to Export-Import Bank, a fee of 1 percent per annum of the portion of each accepted draft covered by the guaranty.

(c) Citibank would deduct for itself an acceptance commission of 1 percent per annum on the Export-Import Bank guaranteed portion and 1½ percent per annum on the remaining portion not covered by the guaranty and carried at Citibank's own risk.

3. Upon receipt of the proceeds of the draft, NBI would deduct its commission charge and remit the balance to Icelandic for use in paying the freezing plant operators a part of the invoice price for their seafood.

4. The shipping documents covering the seafood were transmitted directly to petitioner but on the understanding that Citibank had acquired a security interest in them and the goods

evidenced thereby. Petitioner sold the seafood covered by the documents and transmitted to Citibank a portion of the proceeds sufficient to cover the drafts drawn on Citibank.

This Citibank financing arrangement was used to cover only 54.4 percent of the price of Icelandic's sales to petitioner. On the sales made under the financing arrangement, Icelandic would receive only the net proceeds after the deduction of the financing fees. These net proceeds were less than Icelandic could have obtained from sales to unrelated importers. Such importers would have paid the prevailing market price (or invoice price) for the seafood and would have been responsible for paying any financing costs.

In addition, to permit Icelandic to pay the freezing plant operators the portion of the invoice price not covered by the financing arrangement (i.e., the shortfall), Icelandic borrowed money locally. This borrowing required Icelandic to incur interest expenses which were not normally incurred on Icelandic's sales to unrelated importers.

In 1962, petitioner's management orally agreed to pay Icelandic an amount to be calculated at a rate of 6 percent per annum computed on the outstanding intercompany account balance due Icelandic by petitioner invoiced quarterly. During the period 1963 through 1969, the intercompany transactions were as follows:

| | | |
|---|---|---|
| Value of purchases invoiced | | $75,273,687 |
| Face value of NBI drafts | | 40,235,000 |
| Citibank financing charges | | 1,171,481 |
| Net proceeds to Icelandic | | 39,063,519 |
| Shortfall | | 35,038,687 |
| 6-percent payments: | | |
| 1963 | $218,804 | |
| 1964 | 230,320 | |
| 1965 | 185,267 | |
| 1966 | 202,798 | |
| 1967 | 242,484 | |
| 1968 | 234,418 | |
| 1969 | 71,822 | 1,385,913 |

Each quarter Icelandic submitted to petitioner "interest invoices" and petitioner paid the invoices. Petitioner recorded these payments as interest on its books of account. At the end of

each taxable year, it would close out the interest expense account, to the extent attributable to the quarterly invoices, to a cost of goods sold account.

On or about April 25, 1969, petitioner and Citibank entered into an agreement whereby Citibank agreed to accept drafts, subject to its discount and acceptance commission, drawn by petitioner to its order. Petitioner was obligated to pay these drafts upon maturity. The drafts presented by petitioner to Citibank were accompanied by Icelandic's invoice and, in an aggregate amount, did not exceed $4 million at any one time. Petitioner gave Citibank a security interest in the goods evidenced by the documents.

During 1963 through 1969, petitioner engaged Morris H. Brooks (Brooks) as its accountant. Brooks was aware that petitioner had ceased operating as a commission agent in 1963 and had begun purchasing seafood from Icelandic. He was aware that petitioner paid the drafts accepted by Citibank at their maturity and made the 6-percent quarterly payments to Icelandic. However, he did not review the communications between Icelandic, NBI, and Citibank with respect to the establishment of the Citibank financing arrangement. Under his instructions the 6-percent quarterly payments were recorded in a separate interest account and, at the end of the accounting year, closed into a cost of goods sold account for Federal income tax purposes. It was his opinion that Forms 1042 were not required to be filed for the 6-percent payments and that such payments were not subject to the withholding directions of sections 1441 and 1442.

## OPINION

Section 1442 provides that, in the case of a foreign corporation subject to taxation in the United States (in this case under section 881), "there shall be deducted and withheld at the source * * * on the same items of income as is provided in section 1441 * * * a tax equal to 30 percent thereof." The pertinent items of income referred to in section 1441 are "interest * * * or other fixed or determinable annual or periodical gains, profits, and income." See sec. 1441(b). The issue to be decided is whether the 6-percent payments which petitioner made quarterly to Icelandic were "interest" or other "periodical * * * income." If so,

petitioner should have withheld therefrom the required 30-percent tax. If not, no withholding was required.

We think the 6-percent quarterly payments which petitioner made to Icelandic were interest within the meaning of section 1441. Respondent's determination of the deficiency in the 30-percent withholding tax, therefore, must be sustained.

The parties agree that the term "interest" as used in section 1441 has the same meaning as it has in other Code sections, i.e., compensation for the use, or forbearance, or detention of money. *Deputy v. DuPont*, 308 U.S. 488, 497–498 (1940). They further agree that, for such compensation to constitute interest, it must be paid on indebtedness. In other words, there must be an existing, valid, and enforceable obligation to pay a principal sum. *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932).

We are satisfied that the 6-percent quarterly payments which petitioner made to Icelandic meet this definition. Icelandic shipped seafood directly to petitioner and invoiced it at the prevailing price. The receipt of these shipments created an open-account indebtedness from petitioner to Icelandic. Petitioner discharged that open-account indebtedness (1) by making payments to Citibank sufficient to cover NBI's drafts and (2) by making further payments to Icelandic sufficient to make up the shortfall, i.e., the amount of the purchase price of the seafood due from petitioner which was not covered by the Citibank financing arrangement. In addition, petitioner orally agreed to, and did, make payments to Icelandic in the amount of 6 percent of the quarterly balance owed on the open account.

This open-account indebtedness from petitioner to Icelandic for purchased seafood was a valid and enforceable obligation. The 6-percent rate was applied to the quarterly balance of that account, and the payment thereof compensated Icelandic for its forbearance in not demanding immediate payment for the seafood. Such payment has all the characteristics of interest as that term is used in the business world, and we think that is sufficient for the purposes of sections 1441 and 1442. See *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 805–806 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962) (interest on open account); *Rosenblatt v. Commissioner*, 16 T.C. 100, 104 (1951) (interest on shareholder advance account); *Groves v. Commissioner*, 38 B.T.A. 727, 737 (1938) (interest on shareholder advance account).

It is quite true, as petitioner contends, that Icelandic incurred expenses in selling seafood to petitioner which it would not have incurred had it dealt with unrelated purchasers. These expenses included the discounts and commissions, charged by Citibank and the Export-Import Bank, and the interest charged by NBI, detailed in our Findings, as well as interest on sums Icelandic was required to borrow in order to cover Icelandic's seafood costs which were not financed through the Citibank arrangement. Petitioner regards the 6-percent quarterly payments which it made to Icelandic as reimbursement for such expenses. Petitioner maintains that such payments, therefore, were not interest. We disagree.

The 6-percent payments were computed with reference to the quarterly unpaid balance on petitioner's open account payable to Icelandic and not with reference to Icelandic's expenses. Had petitioner found itself financially able to pay for the seafood as it was delivered, no 6-percent payments would have been due. Moreover, had the payments been mere reimbursements for Icelandic's expenses in helping provide petitioner with operating capital, the precise amount of Icelandic's expenses could have been computed and billed to petitioner for payment. But Icelandic did not do that. Instead, it exacted payments amounting to 6 percent of the open-account quarterly balance.

That Icelandic, in providing petitioner with operating capital, incurred expenses which may have been more or less than the 6-percent payments is beside the point. Lenders of money frequently incur interest and other costs in obtaining funds to lend to others, but costs so incurred do not convert the lender's interest income into reimbursement of such costs. The nature of the payments depends upon whether they were paid in respect of indebtedness—for the use or forbearance of money—and, for the reasons stated, we think petitioner's payments to Icelandic were interest on its open account. Icelandic was no doubt willing to take these extraordinary steps to provide petitioner with operating capital because petitioner was Icelandic's wholly owned subsidiary, and any net profit realized by petitioner ultimately redounded to the benefit of Icelandic and its members.

Indeed, our view of the transaction is confirmed by the manner in which the parties treated it. The quarterly bills which Icelandic sent to petitioner designated the obligation as "invoice-

interest." Petitioner recorded the payments on its books of account as interest payments. While the balance in that interest account was closed to a cost of goods sold account, the closing entries did not indicate the payments were anything other than interest.

We are satisfied, however, that petitioner has shown that the section 6651(a) addition to tax does not apply. We are convinced that, within the meaning of that section, petitioner's failure to file the returns required by section 1461 was "due to reasonable cause and not due to willful neglect."

During the years in issue, petitioner retained the services of Brooks, a certified public accountant, and relied upon him as "an expert in the field." Brooks inquired as to the details of the arrangement pursuant to which the 6-percent payments were made to Icelandic. As a result of his inquiry, he concluded the payments were made to reimburse Icelandic for expenses it incurred in providing petitioner with funds needed for prompt payment for the seafood it purchased. Accordingly, on petitioner's books, the quarterly payments, though designated as interest, were closed to a cost of goods sold account.

While we are satisfied that our conclusion that the quarterly payments were interest is correct, we are not prepared to say that Brooks' opinion to the contrary was the product of negligence or willful disregard of the law. His advice on the necessity for filing a withholding return, in our view, was erroneous, but we do not think it was so clearly wrong as to permit an inference that petitioner, in relying on Brooks' advice, was negligent or that it willfully disregarded the law. *O. Falk's Department Store, Inc. v. Commissioner*, 20 T.C. 56, 65 (1953); *Reliance Factoring Corp. v. Commissioner*, 15 T.C. 604, 608–609 (1950). Petitioner has carried its burden of proof on this issue.

To reflect the foregoing,

*Decision will be entered under Rule 155.*