MARPROWEAR PROFIT-SHARING TRUST C/O HARRY RIBACK, MARTIN RIBACK, JOSEPH WEINBERG, AND CHARLES RIBACK, TRUSTEES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1363–78.     Filed August 22, 1980.

---

*Stephen E. Lamphf,* for the petitioners.
*Joseph F. Maselli,* for the respondent.

STERRETT, *Judge:* By letter dated November 10, 1977, respondent determined deficiencies in income taxes and additions to tax for petitioner's following taxable years and in the following amounts:

| TYE Dec. 31— | Deficiency | Addition to tax under sec. 6651(a) |
|---|---|---|
| 1973 | $24,293 | $6,073 |
| 1974 | 84,546 | 21,137 |

The issues presented are: (1) Whether an amount transferred by Marprowear Corp. to petitioner represented additional acquisition indebtedness upon the purchase of a shopping center by petitioner, within the meaning of section 514(c), I.R.C. 1954, or was merely an advance contribution; (2) whether the section 511 tax should be computed at trust or corporate rates; and (3) whether the section 6651(a) addition to tax is properly imposed.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Marprowear Profit-Sharing Trust (the trust or petitioner) had its offices in Fairfield, N.J., at the time it filed its petition herein. Petitioner was established in connection with the adoption, on April 23, 1968, of a profit-sharing trust by the Marprowear Corp. (corporation). The corporation is a wholesaler of men's and boys' wearing apparel and is also located in Fairfield, N.J. The corporation filed timely returns of income for its taxable years ended December 31, 1973 and 1974.

At its inception, the trust agreement created a trustee committee consisting of Harry Riback, Martin Riback, and Joseph Weinberg, and these three individuals constituted the

committee during the years in issue. The plan, of which the trust was a part, was qualified under section 401(a) throughout the taxable years before us. No amendments to the original plan were made. The plan was restated in 1976 in compliance with ERISA and was approved in August of 1977. Thus, during the taxable years ended December 31, 1973 and 1974, petitioner was part of a qualified profit-sharing plan exempt from tax under section 501(a) since it had met the requirements of section 401(a) and the regulations thereunder.

Petitioner filed Forms 990–P (Annual Return of Fiduciary of Employee's Pension or Profit-Sharing Trust) for the years 1973 and 1974 on May 15, 1974, and April 17, 1975, respectively. Petitioner also filed a Form 4848 (Annual Employer's Return for Employee's Pension or Profit-Sharing Plans) and a Form 4849 (Financial Statement of Employee's Pension Profit-Sharing Fund or Fiduciary Account) for the same years.

On May 10, 1973, petitioner entered into an agreement with the Ledgewood Circle Shopping Center, Inc., for the purchase of a shopping center located on Route 46 in Roxbury Township, N.J., for the sum of $450,000. The purchase price was to be paid as follows: (1) $25,000 on execution of the contract of sale to be held in escrow pending closing; (2) $225,000 on delivery of the deed; and (3) a 25-year note and first purchase-money mortgage for $200,000. Closing occurred on August 1, 1973. At that time the consideration for the purchase was paid as follows:

| Description | Amount |
| --- | --- |
| Paid as deposit on signing of contract | $25,000.00 |
| Credit for securities on leases | 2,466.66 |
| Credit for tenant's payment | 10,500.00 |
| Purchase-money mortgage | 200,000.00 |
| Checks drawn on corporate accounts: | |
| Ch. No. 5193 | 10,861.77 |
| Ch. No. 5198 | 25,000.00 |
| Ch. No. 5199 | 68,000.00 |
| Ch. No. 5202 | 90,000.00 |
| Ch. No. 062161 | 22,000.00 |
| | [1] 453,828.43 |

[1] The $3,828.43 in excess of the $450,000 purchase price was attributable to taxes and insurance adjustments.

Checks numbers 5193, 5198, 5199, and 5202 were drawn on the corporation's account at the National Newark & Essex Bank. In each case, with the exception of check number 5193, the check payor and payee were both Martin Riback. The back of each of these checks was endorsed "Pay to the Order of Joseph S. Sidel Trust Account" followed by Martin Riback's signature. The payee of check number 5193 was the Joseph S. Sidel Trust Account. Check number 062161, in the amount of $22,000, was drawn upon Yorkwood Savings & Loan Association, with the payor being what petitioner described on brief as a "related partnership." Thus, the corporation provided $193,861.77 of the amount paid for the shopping center.

The corporation's 1973 return, Form 1120, Schedule L, reflected this transfer for the benefit of the trust as a "loan" in the amount of $191,763.27.[2] This "loan" was shown under "assets" and was listed in that space labeled "Other Investments—attach schedule," but the label had been stricken and the word "Loans" typed in its place. Schedule M–1 of the return showed an "Excess Contribution" of $3,200.08. The corporation's 1974 Schedule L showed a beginning taxable year "loan" asset of $191,763.27 and an end of taxable year "loan" asset of $240,240.53. The trust's Form 4849 for 1973 showed the purchase-money mortgage as a yearend "acquisition indebtedness" of $198,798.83. It also showed $185,421.35 of the corporation's transfer under yearend "other liabilities." Similarly, the 1974 trust's Form 4849 showed $195,768.17 as "acquisition indebtedness," and $149,421.35 as "other liabilities." The "other liabilities" amount on the trust's Form 4849 was intended to reflect the transfers described above from the corporation to the trust. Similarly, this transfer was shown on the working papers for 1973 and 1974 of the certified public accountant who prepared the trust's various returns and forms as an amount due the corporation, as opposed to an employer contribution. Indeed "contributions," per se, were listed separately on these papers and thereby specifically

---

[2] We here take the opportunity to note the unexplained variability of the exact amount transferred. The corporate returns showed a 1973 loan to the trust of $191,763.27. The trust's 1973 Form 4849 financial statement showed the transfer from the corporation as an "other liability" for 1973 of $185,421.35. Yet the work papers of the trust's return preparer, who worked for both the corporation and the trust, showed the amount due to the corporation as $193,861.71.

distinguished from amounts due to, or loans from, the corporation.

In 1973, the tenants of the Ledgewood Circle Shopping Center were:

W. T. Grant Co.
My Lady
Straco Auto Supplies
Spagnola & Mabe Real Estate
Eckert Enterprises (Wash-O-Mat)
Sherwin Williams (paint store)
Fotomat Corp.
Ledgewood Circle Pharmacy (Weitz)
Merit Shoe (Endicott-Johnson)
Marprowear Corp.
Martin Process Co.

In 1974, the tenants were identical with those above, with the addition of Ledgewood Outdoor and the elimination of W. T. Grant as a tenant. W. T. Grant still made rental payments through February 1974.

Shortly after closing, the trust was informed by W. T. Grant Co. (Grant) that it did not intend to renew its lease which expired on February 28, 1974. This put the trust in a quandary. It had purchased the shopping center on the assumption that Grant would renew its lease. Without Grant, the shopping center had lost a major store that attracted many customers. Grant's decision to leave the shopping center made the wisdom of the trustees' investment questionable.

The trustees believed that the seller had not been candid with them. Negotiations were, therefore, opened for a reduction of the sales price to reflect the lower value of the shopping center without Grant. These negotiations led to a reduction in the sales price. The agreement on this point was reflected in a letter dated January 2, 1975, from the seller to the trust:

Mindful of the difficulties that you are confronted with, and facing in view of the vacancy of W. T. Grant from the premises, etc., this is to confirm our agreement that there will be allowed to you a reduction of $58,000 provided the mortgage is satisfied during the year 1975.

The purchase-money mortgage referred to in the letter was paid in full in December of 1975 for $135,000.

## OPINION

First we consider respondent's claim that the transfers made by the corporation should be includable as "acquisition indebtedness" in the computation of the shopping center's "average acquisition indebtedness" for purposes of section 514. In computing unrelated business taxable income for any taxable year, section 514 includes in gross income, with respect to each debt-financed property, an amount which is the same percent (but not in excess of 100 percent) of the total gross income derived during the taxable year from the debt-financed property as:

(A) the average acquisition indebtedness (as defined in subsection (c)(7)) for the taxable year with respect to the property is of (B) the average amount (determined under regulations prescribed by the Secretary or his delegate) of the adjusted basis of such property during the period it is held by the organization during such taxable year.

Clearly, and as petitioner concedes on brief, the purchase-money mortgage it obtained on the shopping center is "acquisition indebtedness" for section 514 purposes. See sec. 514(c)(1)(A). The precise question before us is whether the transfers from the corporation to petitioner to purchase the shopping center should be considered in the computation of the section 514(a)(1) fraction (which is also used in determining allowable deductions, sec. 514(a)(2) and (3)) in determining the percent of income from the shopping center to be taken into account for the section 511 tax.[3]

---

[3] Secs. 511, 512, and 514 read as follows during the taxable years before us:

SEC. 511(b). TAX ON CHARITABLE, ETC., TRUSTS.—

(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income of every trust described in paragraph (2) a tax computed as provided in section 1(d). In making such computation for purposes of this section, the term "taxable income" as used in section 1 shall be read as "unrelated business taxable income" as defined in section 512.

(2) CHARITABLE, ETC., TRUSTS SUBJECT TO TAX.—The tax imposed by paragraph (1) shall apply in the case of any trust which is exempt, except as provided in this part or part II (relating to private foundations), from taxation under this subtitle by reason of section 501(a) and which, if it were not for such exemption, would be subject to subchapter J (sec. 641 and following, relating to estates, trusts, beneficiaries, and decedents).

SEC. 512(a). DEFINITION.—For purposes of this title—

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

SEC. 514(a). UNRELATED DEBT-FINANCED INCOME AND DEDUCTIONS.—In computing under section 512 the unrelated business taxable income for any taxable year—

Respondent contends that the corporate transfers herein constituted a loan includable in the acquisition indebtedness incurred by the trust in acquiring the shopping center for purposes of section 511. Petitioner argues that, far from being a loan, the amount it received from the corporation was received as an advance contribution from the corporation to the profit-sharing plan of which the trust was a part.

The question of whether the transfer before us is a loan or an advance is one of fact. From all the evidence, we must determine whether the parties to the transacton, the corporation and the profit-sharing plan's trust, both of which were governed by the same individuals, intended the approximately $193,000 transfer to be repayable as a loan. There is no direct evidence of these organizations' intentions in the record. Therefore, our decision must be based upon circumstantial evidence.

From all the evidence, we conclude that the transfer was a

---

(1) PERCENTAGE OF INCOME TAKEN INTO ACCOUNT.—There shall be included with respect to each debt-financed property as an item of gross income derived from an unrelated trade or business an amount which is the same percentage (but not in excess of 100 percent) of the total gross income derived during the taxable year from or on account of such property as (A) the average acquisition indebtedness (as defined in subsection (c)(7)) for the taxable year with respect to the property is of (B) the average amount (determined under regulations prescribed by the Secretary or his delegate) of the adjusted basis of such property during the period it is held by the organization during such taxable year.

* * * * * * *

(c) ACQUISITION INDEBTEDNESS.—

(1) GENERAL RULE.—For purposes of this section, the term "acquisition indebtedness" means, with respect to any debt-financed property, the unpaid amount of—

(A) the indebtedness incurred by the organization in acquiring or improving such property;

(B) the indebtedness incurred before the acquisition or improvement of such property if such indebtedness would not have been incurred but for such acquisition or improvement; and

(C) the indebtedness incurred after the acquisition or improvement of such property if such indebtedness would not have been incurred but for such acquisition or improvement and the incurrence of such indebtedness was reasonably foreseeable at the time of such acquisition or improvement,

* * * * * * *

(7) AVERAGE ACQUISITION INDEBTEDNESS.—For purposes of this section, the term "average acquisition indebtedness" for any taxable year with respect to a debt-financed property means the average amount, determined under regulations prescribed by the Secretary or his delegate, of the acquisition indebtedness during the period the property is held by the organization during the taxable year, except that for the purpose of computing the percentage of any gain or loss to be taken into account on a sale or other disposition of debt-financed property, such term means the highest amount of the acquisition indebtedness with respect to such property during the 12-month period ending with the date of the sale or other disposition.

loan. The transaction was reflected as a loan on all the relevant returns and forms filed by both the trust and the corporation during the taxable years before us. The transfer was shown as an amount due to the corporation on the certified public accountant's trust working papers. On the other hand, there is no evidence contemporaneous with the actual transfer which would indicate that the transfer was a contribution. Petitioner points to the fact that it charged off and deducted $27,787.50 of the 1973 transfer as a contribution to the plan for that year. This fact is not inconsistent with the existence of a loan. The corporation could have easily directed that year's loan repayment from the trust back to the trust as a contribution. Petitioner points to a $10,000–$20,000 advance contribution made by the corporation to the trust in 1969. From this single instance of prefunding, petitioner argues that it had a past history of prefunding payments. One payment does not a history make. Respondent subpoenaed all of petitioner's papers dealing with the 1973 transfer. No corporate resolution or, indeed, any other paper, was produced which would show the nature of the transfer was other than that which it and the corporation told respondent it was when they filed the returns and forms for the years before us, i.e., a loan.

Thus, we hold that the transfer was a loan. Because this indebtedness was incurred to acquire the shopping center, and as the shopping center was clearly acquired to produce income, and as this indebtedness is not inherent in the performance or exercise of the function which is the basis of the trust's exemption, we conclude that the loan was an "acquisition indebtedness" within the meaning of section 514(c). See sec. 514(c)(4).[4] Because the shopping center was acquired with acquisition indebtedness and was held for the purpose of producing income, which use was not substantially related to the trust's exempt function aside from its need for income, we conclude, further, that the shopping center was "debt-financed

---

[4] SEC. 514(c)(4). INDEBTEDNESS INCURRED IN PERFORMING EXEMPT PURPOSE.—For purposes of this section, the term "acquisition indebtedness" does not include indebtedness the incurrence of which is inherent in the performance or exercise of the purpose or function constituting the basis of the organization's exemption, such as the indebtedness incurred by a credit union described in section 501(c)(14) in accepting deposits from its members.

property" within the meaning of section 514(b)(1). Sec. 514(b)(1)(A)(i).[5] This being the case, the appropriate section 514(a)(1) percentage of the gross income derived by the trust from the shopping center is taxable as "unrelated business taxable income."

Petitioner argues that we should reduce the trust's "average acquisition indebtedness" on the purchase of the shopping center by the $58,000 reduction of the purchase price negotiated by the parties in 1975. There is no doubt that in 1975, 2 years after the shopping center was purchased, the trust negotiated a reduction of the purchase price. In exchange for this agreed reduction, however, the seller demanded and received a quid pro quo, i.e., the agreement by the trust that it would pay off the purchase-money mortgage it had taken out on the property in the year of reduction, 1975. In this way, petitioner agreed to pay off the mortgage, reduced to $135,000, all in 1 year, rather than over 25 years at 7.25 percent. Clearly, this reduction in the amount due under the mortgage 2 years after the property was acquired cannot alter the amount that in 1973 was the property's "acquisition indebtedness" within the meaning of section 514(c). The "average acquisition indebtedness" with respect to debt-financed property is the average amount of the outstanding principal indebtedness during that portion of the taxable year the property is held by the organization, determined as of the first day of each calendar month. Sec. 1.514(a)–1(a)(3), Income Tax Regs. Were this not so, then no property's "acquisition indebtedness" could ever be fixed. Under petitioner's theory, any mortgage payments, prepayments, or negotiated reductions of any sort in any following taxable year would reduce the

---

[5]SEC. 514(b). DEFINITION OF DEBT-FINANCED PROPERTY.—

(1) IN GENERAL.—For purposes of this section, the term "debt-financed property" means any property which is held to produce income and with respect to which there is an acquisition indebtedness (as defined in subsection (c)) at any time during the taxable year (or, if the property was disposed of during the taxable year, with respect to which there was an acquisition indebtedness at any time during the 12-month period ending with the date of such disposition), except that such term does not include—

(A)(i) any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function designated in section 501(c)(3)), or (ii) any property to which clause (i) does not apply, to the extent that its use is so substantially related * * *

property's "acquisition indebtedness." We cannot accept such an interpretation.

Finally, we come to petitioner's claim that, if taxable, the trust is taxable at corporate rates. Section 511(b)(1) imposes on the unrelated business taxable income of every trust described in section 511(b)(2) a tax computed as provided in section 1(d)(now sec. 1(e)). Section 511(b)(2) applies the (b)(1) tax to any trust, with exception not here applicable, exempt from tax, and which, were it not for such exemption, would be subject to the rules described in subchapter J.

Apparently, petitioner's argument on this front centers around its reading of the trust regulations. Thus petitioner argues on brief that: "The Regulations under Subchapter J provide that Part 1 (trust rates) is not applicable to any organization which is to be classified for tax purposes as a trust under the classification rules of section 301.7701–2, –3, and –4 of this Chapter." While we were not provided with a citation, the sentence petitioner has attempted to paraphrase may be contained in section 1.641(a)(O)(a), Income Tax Regs. However, that sentence reads somewhat differently. There is an additional negative: "Part 1 has *no* application to any organization which is *not* to be classified for tax purposes as a trust under the classification rule of sections 301.7701–2, 301.7701–3 and 301.7701–4 of this chapter." Thus, the trust-section regulations apply to trusts and do not apply to organizations which are not trusts.

Petitioner goes on to argue that: "The Regulations under section 301.7701–4 provide that the fact that any organization is technically cast in the trust form, by conveying property to trustees for the benefit of persons designated as beneficiaries, it will not change the real character of the organization if, by applying the principles set forth in section 301.7701–2 and –3, the organization more nearly resembles an association or partnership than a trust." The foregoing, obviously, merely states, or perhaps, begs the question here at issue. We find that the facts, here, do not justify taking the petitioner as a corporation. In so holding we are doing it a favor.

On the record before us, we find that the trust is operated for an exempt purpose and not as an organization with the objective of operating a business and dividing the gains therefrom. See sec. 301.7701–2(a)(1), Proced. & Admin. Regs. Consequently, it is

entitled to its exempt status. Thus, the trust is taxable as a trust, at trust rates, to the extent required by section 511 et seq., and this opinion.

The final dispute relates to respondent's claim for the section 6651(a) addition to tax for failure to file.[6] The section 6651(a) addition applies in the case of any failure to file any return required under authority of subchapter A of chapter 61, other than part III thereof. Respondent bases his section 6651(a) claim upon petitioner's failure to file timely Form 990–T for the years before us. The requirement that Form 990–T be filed relates to every trust "described in section 501(c)(3) or (17), or section 401(a), which is otherwise exempt from tax under section 501(a), and which is subject to the tax imposed on unrelated business taxable income by section 511(b)(1)." Sec. 1.6012–3(a)(5), Income Tax Regs.

If, therefore, petitioner's failure to file the Forms 990–T required of it was not due to "reasonable cause," the section 6651(a) addition is due. Petitioner argues that it is not liable for the addition to tax because it relied upon the expert advice of its certified public accountant. Respondent argues that the addition is due because "at least Mr. Riback, one of the trustees, was aware of the problem involving debt finance income and chose not to file Forms 990–T."

Petitioner has the burden of proving that reasonable cause for the failure to file timely, exists. *Ferrando v. United States*, 245 F.2d 582, 589 (9th Cir. 1957); *Latham Park Manor, Inc. v. Commissioner*, 69 T.C. 199, 219 (1977), affd. in an unpublished opinion (4th Cir., Jan. 28, 1980). The general rule is that taxpayer's duty to file a return when due is a personal, nondelegable duty. Reliance upon an accountant to file is, thus, no excuse for late filing. See *Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 854 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court. *Ferrando v. United States, supra* at

---

[6] SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) ADDITION TO THE TAX.—In case of failure—

(1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate * * *

589. Reasonable cause for failure to file a timely return can be shown, however, by proof that the taxpayer acted in good-faith reliance upon the advice of an accountant to whom all the relevant facts were revealed (*Paula Construction Co. v. Commissioner*, 58 T.C. 1055, 1061 (1972), affd. per curiam 474 F.2d 1345 (5th Cir. 1973)), and that petitioner relied upon the accountant's advice with respect to a question of tax law. *West Coast Ice Co. v. Commissioner*, 49 T.C. 345, 351 (1968).

Petitioner's accountant testified. We found him to be generally knowledgeable in the tax law. He was apprised of all the facts. While we are satisfied with our conclusion that petitioner is liable for the tax on unrelated business taxable income, we are not prepared to say that the accountant's opinion to the contrary was a product of negligence or willful disregard of the law. Further, while the advice was erroneous on this point, we do not think it was so clearly wrong as to permit on inference that petitioner, in relying upon that advice, was negligent or that it willfully disregarded the law. See *Coldwater Seafood Corp. v. Commissioner*, 69 T.C. 966, 974 (1978).

*Decision will be entered for the respondent.*