JOHN A. LANEY AND JEANINE LANEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Laney v. Comm'r
Docket No. 4065-77. United States Tax Court
T.C. Memo 1979-491; 1979 Tax Ct. Memo LEXIS 35; 39 T.C.M. (CCH) 654; T.C.M. (RIA) 79491; December 6, 1979, Filed Jeffrey H. Hubbard, for the petitioners. Robert *37 B. Perry, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax pursuant to section 6651(a)[1] as follows: Taxable
Addition to Tax
Year
Deficiency
Section 6651(a)
1971
$168,826.46
$64,653.22
1972
61,293.57
12,027.50
1973
62,998.07
11,736.96
The issues for our decision are: (1) Whether petitioners may deduct losses from a partnership (Hollister Hempstead, Ltd.), in which Mrs. Laney was a limited partner, in excess of her adjusted basis of $1,000 in 1971 and zero in 1972. (2) Whether petitioners are entitled to a loss in excess of $22,934 upon the termination of the Hollister, Ltd. partnership during 1973. (3) Whether the amounts of depreciation claimed by petitioners in 1973 with respect to certain realty and equipment are correct. (4) Whether petitioners have adequately substantiated their short-term capital loss from the sale of rental apartment furniture *38 in 1972. (5) Whether petitioners' failure to file timely Federal income tax returns for 1971, 1972 and 1973 makes them liable for the additions to the tax provided by section 6651(a). FINDINGS OF FACT Petitioners John A. Laney and Jeanine Lancy, husband and wife, resided in Houston, Texas, at the time they filed their petition in this case. They filed joint Federal income tax returns for the taxable years 1971, 1972, and 1973 with the Internal Revenue Service Center at Austin, Texas, on October 2, 1973, January 22, 1974, and November 18, 1975, respectively. Facts Relating To Issue 1
During the taxable years in issue John A. Laney (petitioner) was self-employed as a financial advisor and a real estate broker-promoter in the Houston, Texas, area. In late 1970, petitioner made inquiries concerning the development of certain property in Harris County, Texas, for apartment dwellings. On January 5, 1971, Baker Oil Tools, Inc. contracted to sell to petitioner, through a nominee, certain real estate in Harris County, Texas, for a purchase price of $1,000,000. Shortly thereafter the petitioner contacted W. T. Duncan (Duncan) by letter concerning the development of an *39 apartment complex on the Harris County property under contract. Petitioner and Duncan agreed that a development corporation would be organized. In addition, the parties contemplated the formation of a limited partnership in which the corporation would be a general partner and in which petitioner's wife, Duncan and Leo Covington would be limited partners. On February 3, 1971, Hollister Hempstead Corporation (hereinafter Corporation) was organized under the laws of Texas. The corporation had three shareholders. Duncan and Leo Covington each owned a 25 percent interest and the petitioner owned the remaining 50 percent. From its organization until mid-1973, Duncan was president of the corporation and ordinarily signed all corporate documents. Shortly after its formation, Corporation made an application for a loan from Surety Savings Association of Houston, Texas, in the amount of $1,550,000 for the purchase of the real estate which was the subject of the January 5, 1971, contract. On the same date a special meeting of the board of directors of the Corporation was held for the purpose of accepting a loan in the amount of $1,550,000 from Surety Savings Association.The resolution *40 was adopted unanimously by the board and Duncan was authorized to make such loan for and on behalf of the Corporation and to execute the Note and Deed of Trust as an officer of the Corporation. On February 9, 1971, the real estate which was the subject of the January 5, 1971, contract was conveyed to petitioner's nominee for a purchase price of $1,000,000. On the same date the property was sold by petitioner's nominee to the Corporation for $1,175,504.30.[2]
On February 5, 1971, Duncan, on behalf of the Corporation executed a mortgage loan note in the amount of $1,550,000 bearing interest at 9-1/2 percent due one year from the date of execution. Simultaneously a lien securing the amount of the note was placed on the property (hereinafter HH Real Estate) in favor of Surety Savings Association by a Deed of Trust from the Corporation. In addition, Duncan guaranteed the loan. In turn, petitioner indemnified Duncan. Section 9 of the Deed of Trust Provided in part: Notwithstanding any provision in the Note secured hereby and in this Deed of Trust, Grantors *41 convenant and agree that until the indebtedness secured hereby is fully paid, they will not sell and convey the property above described to any person or persons without the written consent of the Association… On June 30, 1971, the Corporation made applications for loans to B.F. Saul Real Estate Investment Trust (hereinafter Trust) in the amounts of $1,975,000 and $4,325,000. The purpose of the loans was to obtain money for the construction of apartments on the HH Real Estate. On September 8, 1971, a Construction Loan Agreement between the Trust and the Corporation was executed. The Construction Loan Agreement provided that: Section 3. Conditions Precedent to Lenders'Obligations: * * * (3) Prior to each advance, Lender shall have received a notice of title continuation or an endorsement with respect to the Title Binder therefore delivered, indicating that since the last preceding advance, there has been no change in the state of title not approved by the Lender, which endorsement shall have the effect of increasing the coverage of the policy by an amount equal to the advance then being made if the policy does not by its term provide for such additional coverage *42 without such an endorsement. * * *
Section 4. Borrower's Representation, Warranties, and Covenants: * * * (2) All information set forth in the Loan Application is true and correct. * * *
(4) Borrower will not convey or encumber the Premises or the Improvements or any portion thereof or interest therein in any way without the prior written consent of Lendor. * * *
(6) Borrower will pay all costs and expenses required to satisfy the conditions of this agreement. Without limitation or generality of the foregoing Borrower will pay all taxes and recording expenses, including stamp taxes, if any, the fees and commissions, if any, lawfully due to brokers in connection with this transaction, and the reasonable fees and expenses of counsel for the Lender and the Independent Supervising Architect in connection with this Agreement and all transactions pursuant hereto. * * *
(10) Each of the representations, warranties, and convenants made by Borrower herein shall be considered and deemed to have been made again at and as of the time the Borrower delivers to Lender each Request for Advance and Lender makes an advance pursuant to this Construction Loan Agreement. (11) Except as heretofore disclosed to the Lender in writing, the Borrower has made no contract or arranement of any kind the performance of which by the other party thereto would give rise to alien on the Premises and Improvements of equal or greater priority than the liens created under the Deed of Trust. (12) Borrower is duly authorized and empowered to create and issue the Note and to execute and deliver this Agreement and all other instruments referred to or mentioned herein to which Borrower is a party. All actions on Borrower's part requisite for the creation, issuance, execution and delivery of the Note, this Agreement and such other instruments have been duly and effectively taken. On September 8, 1971, promissory notes in the amounts of $4,325,000 and $1,975,000 payable to the Trust were executed by Duncan. In order to obtain the loans from the Trust, Duncan and his wife were required to guarantee payment of the notes by the Corporation when the amounts of the notes becames due. Petitioner indemnified Duncan on these notes. On May 6, 1971, the Corporation applied for a construction loan from First Mortgage Investors (herein-after fmi/) in the amount of $6,862,500. The mortgage application listed the mortgagor as the Corporation, and the application was executed by Duncan. On June 25, 1971, FMI issued a commitment letter to the Corporation for a loan in the amount of $6,862,500. The construction loan commitment was accepted by the Corporation on June 30, 1971. In order to obtain the loan from FMI, the Corporation had to obtain an irrevocable letter of credit in the amount of $375,000 as security for interest payments. The Corporation obtained the necessary letter of credit through Newton B. Schwartz and agreed to indemnify him for any loss he sustained on the letter of credit. The cost of the letter of credit ($7,770.83) was paid by the petitioner and was deducted by the petitioners on Schedule C of their 1971 Federal income tax return as a Commitment Fee. On June 14, 1974, the indemnification agreement between the Corporation and Mr. Schwartz was released. The release was executed for the Corporation by its then preseident, John A. Laney, the petitioner. An additional requirement to obtain the loan from FMI was the requirement that the Corporation pay a commitment fee of $65,000 which amount was paid by the petitioners and deducted as a commitment fee on Schedule C of their 1971 Federal income tax return. On July 26, 1971, the Corporation executed its promissory note to FMI in the amount of $6,862,500. In addition, Duncan executed a Continuing Guaranty to FMI. Petitioner thereafter indemnified Duncan. On the same date a Deed of Trust was executed by the Corporation in favor of the trustees of FMI which created a lien in the HH Real Estate to secure the payment of the note. The Deed of Trust provided: 11.That, if Trustor or any party constituting Trustor is a corporation, the execution and delivery of this Deed of Trust has been duly authorized by the Board of the Directors of such corporation; and that, if required by the Certificate of Incorporation of such corporation, the execution and delivery of this Deed of Trust has been duly consented to by the stockholders of such corporation. The Trustor, if a corporation, will do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a business or stock corporation under the laws of the State of its incorporation and will comply with all requalations, rules, ordinances, statutes, orders and decrees of any Governmental Authority or court applicable to the Trustor or to the Mortgaged Property or any party thereof. * * * 16. No conveyance shall be made by the Trustor of the Premises herein described, or any part hereof, without first obtaining the prior written consent of the Beneficiary. * * *
42. The Trustor convenants, that in the event the ownership of such property or any part thereof becomes vested in a person other than the Trustor, the Beneficiary may,without notice to the Trustor, deal with such successor or successors in interest with reference to this Deed of Trust and the debt hereby secured in the same manner as with the Trstor, and may forbear to sue or may extend time for payment of the debt secured thereby, without discharging or in any way effecting the liability of the Trustor hereunder or under the debt here-by secured. On June 22, 1971, the Corporation applied for a construction loan from Fidelity Mortgage Investors. The application required $68,000 to be deposited with the lender. In connection with the deposit, the petitioners gave their check in the amount of $18,500 to Bill S. Skinner on May 14, 1971, and on July 27, 1971, they authorized Mr. Skinner to disburse the funds directly to Fidelity Mortgage Investors. The $18,500 paid by the petitioners was deducted on their 1971 income tax return and report on their Schedule C as a Commitment Fee. On August 31, 1971, the Corporation obtained a loan from Fidelity Mortgage Investors in the amount of $6,862,500. On the same date the parties entered into a Construction Loan Agreement which contained the following provisions: (b) If the Borrower is a corporation, the Lender's counsel shall have been provided with an approved the following: 1. Certificate of Incorporation of the Borrower and all amendments thereof, certified by the Secretary of State of the state of its incorporation together with a certificate of said Secretary of State to the effect that the Borrower is in good standing therein, and a Tax Payment Certificate evidencing payment of all taxes of the Borrower, the nonpayment of which would effect the existence or good standing of the Borrower in such state; 2. The bylaws of the Borrower certified by the Secretary of the Borrower; 3. A Certified Resolution of the Board of Directors of the Borrower authorizing the consummation of the transactions contemplated hereby; 4. Certificate of Incumbency showing the present officers of the Borrower; 5. If the Borrower is a foreign corporation with respect to the state wherein the Improvements will be made evidence that the Borrower has met all of the requirements for qualification to do business in the State of Texas; and 6. An Opinion of Counsel to the effect that the Borrower has the authority to enter into this Agreement, the Note and the Mortgage and that when same have been executed they will constitute valid and binding obligations of the Borrower. (7) At the time of each disbursement of Construction Loan proceeds to be made to the Borrower hereunder, and as prerequisite thereof, the Title Insurance Company that issued the Mortgagee title policy shall issue a title certificate to the Lender which shall certifiy that there are no changes in the condition of the title of the Property from the condition thereof as set forth in the original title policy issued by the Title Insurance Company to the Lender. In the event said title certificate indicates an objection or defect to, or could upon, the title of the Property arising subsequent to the issuance of the original title policy, the Borrower shall pay said monies, take such action, or do whatever is necessary in the opinion of the Lender to cure any such objection, defect or cloud, and the Lender shall not be required to disburse any moneys until the Title Insurance Company is able to certify to the Lender that such objection, defect or cloud has been cured. * * *
17 The happening of any one or more of the following events shall constitute a default of this Loan Note and Mortgage: (a) The Borrower shall fail to make the interest payments monthly on the due date. (b) The Borrower shall fail to make any required repayment of principal or any portion thereof, on the due date. (c) The Borrower violating any term, condition, or representation contained in this Agreement, Note and Mortgage. * * *
(e) The filing of a voluntary or involuntary petition in bankruptcy under any chapter of the Bankruptcy Act, making any assignment for the benefit of creditors, or being insolvent. (f) The institution of foreclosure action against the Property,or the filing of a lien against the Property which is not removed of record, bonded or dismissed within ten (10) days after such filing. (g) Any condition or situation which, in the sole determination of the Lender, constitutes a danger or impairment to the security of the Loan and such condition or situation is not remedied within ten (10) days after written notice to the Borrower to remedy such condition or situation. The Mortgagee agrees that it will exercise this right in an unreasonable manner. 26. The Borrower agrees to promptly and fully observe and comply with all requirements of the Lender with respect to the condition of the title to the Property, any of the terms and conditions of this Agreement, the Mortgage and the Promissory Note, disabursements or advancements, proof as to payment of construction and subcontractors' bills, surveys, inspections, proofs of construction progress, waivers, partial releases and satisfaction of liens, execution of papers and closing and deposit for cost. 27. The Borrower shall not assign this Agreement or any part of any advance to be made hereunder, nor convey nor further encumber the property of the Borrower or the Contractor with-out the Lender's written consent. As additional security for the note, Fidelity Mortgage Investors required Duncan and his wife to guarantee payment of the corporate note. Petitioner thereafter indemnified Duncan. Subsequent to execution of the Note, Deed of Trust and Construction Loan Agreement, the Corporation made requests for payments against the funds loaned by Fidelity Mortgage Investors. On March 27, 1972, the Corporation made a request for the payment of the contractors' draw for the period from February 26, 1972 through March 27, 1972. On November 8,1971, the Corporation, W.T. Duncan, Leo Covington, and Jeanine W. Laney agreed to form a limited partnership in which the Corporation would be the only general partner. The name of the limited partnership was Hollister Hempstead, Ltd. On November 8, 1971, the Corporation deeded the HH real estate to the partnership. The deed from the Corporation was not recorded and no formal notice was given to any of the Corporation's lenders concerning the deed. On January 25, 1972, a copy of the Articles of Limited Partnership, which had been executed on November 8, 1971, by the parties, was filed with the office of the Secretary of the State of Texas. The Articles of Limited Partnership stated that the general partner was not required to make a capital contribution and that the limited partners were to make capital contributions to the partnership as follows: Limited Partner
Amount of Contribution
Leo Covington $ 500
W. T. Duncan
500
Jeanine W. Laney
1,000
The amounts listed as capital contributions of the limited partners were paid to the partnership by the limited partners.
The Articles of Limited Partnership also contained the following language: The limited partners shall not be personally liable for any of the debts of the partnership or any of the loss thereof beyond the amount originally contributed by them to the capital of the partnership, anything to the contrary herein inferable notwithstanding. For 1971, petitioners reported a loss from the Hollister Hempstead, Ltd. partnership in the amount of $456,997.02 on their 1971 Federal income tax return. On June 15, 1972, the Hollister Hempstead, Ltd. partnership was terminated. About the same time a limited partnership entitled Hollister, Ltd. was formed in which the Corporation and Jeanine W. Laney were general partners. For 1972, petitioners reported a loss from the Hollister Hempstead Ltd. partnership of $241,469.34 and a loss of $555,962 from the Hollister Ltd. partnership. On March 12,1973, the general partners of Hollister, Ltd. assigned their interest in the partnership property to representatives of the various construction lenders. The assignment was executed on March 12, 1973, by the Corporation with petitioner John A. Laney, vice-president, signing the document. Due to the Corporation's failure to make its required payments, the three development lenders, FMI, the Trust and Fidelity Mortgage Investors foreclosed on the HH Real Estate during 1973. He trustee for FMI sold the HH Real Estate and issued a Trustee's Deed on September 4, 1973. On July 2,1973, the Corporation filed for bankruptcy. The corporate charter of the Corporation was revoked on March 22, 1974. The Corporation was later adjudicated a bankrupt and the case was closed on April 9, 1975. On September 8, 1971, promissory notes in the amounts of $4,325,000 and $1,975,000 payable to the Trust were executed by Duncan. In order to obtain the loans from the Trust, Duncan and his wife were required to guarantee payment of the notes by the Corporation when the amounts of the notes becames due. Petitioner indemnified Duncan on these notes. On May 6, 1971, the Corporation applied for a construction loan from First Mortgage Investors (herein-after fmi/) in the amount of $6,862,500. The mortgage application listed the mortgagor as the Corporation, and the application was executed by Duncan. On June 25, 1971, FMI issued a commitment letter to the Corporation for a loan in the amount of $6,862,500. The construction loan commitment was accepted by the Corporation on June 30, 1971. In order to obtain the loan from FMI, the Corporation had to obtain an irrevocable letter of credit in the amount of $375,000 as security for interest payments. The Corporation obtained the necessary letter of credit through Newton B. Schwartz and agreed to indemnify him for any loss he sustained on the letter of credit. The cost of the letter of credit ($7,770.83) was paid by the petitioner and was deducted by the petitioners on Schedule C of their 1971 Federal income tax return as a Commitment Fee. On June 14, 1974, the indemnification agreement between the Corporation and Mr. Schwartz was released. The release was executed for the Corporation by its then preseident, John A. Laney, the petitioner. An additional requirement to obtain the loan from FMI was the requirement that the Corporation pay a commitment fee of $65,000 which amount was paid by the petitioners and deducted as a commitment fee on Schedule C of their 1971 Federal income tax return. On July 26, 1971, the Corporation executed its promissory note to FMI in the amount of $6,862,500. In addition, Duncan executed a Continuing Guaranty to FMI. Petitioner thereafter indemnified Duncan. On the same date a Deed of Trust was executed by the Corporation in favor of the trustees of FMI which created a lien in the HH Real Estate to secure the payment of the note. Facts Relating To Issue 2
On their 1973 Federal income tax return the petitioners claimed a loss in the amount of $44,034 from the termination of Mrs. Laney's partnership interest in Hollister, Ltd. The partnership reported her loss on its return from the termination of the partnership in the amount of $22,934 and issued a Schedule K-1 to Mrs. Laney which Showed that amount. Facts Relating To Issue 3
For the taxable year 1973 the petitioners claimed depreciation deductions for the Sugar Hill Apartment complex and for commercial buildings in the amount of $143,276.94. The apartment project and the commercial buildings are located in Houston, Texas. The useful lives claimed by the petitioners were as follows: Property
Useful Life Claimed
Apartment Buildings
20 years
Apartment Applicances
5 years
Apartment Air Conditioning
5 years
Metal Building
15 years
Store Building
15 years
The respondent determined in the notice of deficiency that the useful lives of the depreciable assets were as follows: Property
Useful Life
Apartment Buldings
30 years
Apartment Applicances
10 years
Apartment Air Conditioning
8 years
Metal Building
20 years
Store Building
25 years
Petitioner in mid-1973 acquired the Sugar Hill complex during its construction stage. At the time of acquisition approximately $1,800,000 of a $3,447,000 construction loan had previously been expended. Petitioner agreed as part of the purchase price to take over the obligation under the construction loan. For the nine months prior to petitioner's acquisition of Sugar Hill no work had been performed on the complex. As a result, much of the structrual wood and other materials had been exposed to the elements. The complex was constructed with poor quality materials, including inexpensive brick facing, hollow doors, and a cheap grade pine frame.The applicances and air conditioning units placed in the apartments were the least expensive models, frequently malfunctioned, and in light of the abuse given to the units by the high turnover of tenants had a maximum life of five years. It is likely that as the city's commercial center moves into the area in which the apartments are located, the apartment development will be torn down for a more profitable use of the underlying land. The Sugar Hill Complex, when completed, was to have 234 apartments and a recreation building. Of the 234 units petitioner obtained occupancy permits for 26 units on December 17, 1973. The remaining apartments were issued occupancy permits during 1974. The apartment complex satisfied the Houston City Building Code requirements. On January 14, 1974, the general contractor submitted an application for payment covering the work completed from December 11, 1973 to January 11, 1974, in the amount of $111,748. Prior to December 11, 1973, $1,094,417 of the remaining $1,677,000 of construction monies had been expended by petitioner. The balance of the $1,677,000 was expended in 1974. Facts Relating To Issue 4
On their 1972 Federal income tax return the petitioners claimed a loss on the sale of apartment furniture and a washateria in the amount of $15,316.20. Petitioners had a basis in the property of $164,029.82 and sold the properties for $150,000. Facts Relating To Issue 5
Petitioners employed Mr. Price, an accountant, to prepare their 1971, 1972, and 1973 Federal tax returns. In each year a request for an extension was filed and granted.However, the returns were not filed within the period of extension. The returns for 1971, 1972, and 1973 were eventually filed on October 2, 1973, January 22, 1974, and November 18, 1975, respectively. OPINION Issue 1: Deductibility of Partnership Losses
The basis of a partnership interest acquired by a contribution of money to the partnership is the amount of such money at the time of the contribution.Section 722. In addition, ay increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership. Section 752(a). In determining how a partner is to allocate recourse partnership liabilities to his basis, section 1.752-1(e), Income Tax Regs., provides that: A partner's share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreement. In a limited partnership a limited partner ordinarily does not share in the losses of the partnership and is generally liable for recourse liabilities only to the extent of his capital contribution. Since the capital contribution is already reflected in the limited partner's basis by virtue of section 722, no adjustment to the limited partner's basis is made for any partnership recourse liabilities. Rather, partnership recourse liabilities are allocated solely to the general partners in the ratios, among the general partners, of sharing losses. A limited partner, however, may share in some of the basis allocation with respect to partnership recourse liabilities if he is willing to obligate himself to make further capital contributions under the partnership agreement. The regulations provide, in pertinent part, that: In the case of a limited partnership, a limited partner's share of partnership liabislities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. [Section 1.752-1(e), Income Tax Regs.] The allocation rules under the regulations, however, with respect to nonrecourse partnership liabilities are different. Section 1.752-1(e), Income Tax Regs., provides that: Where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share profits. Thus, determinations of the nature of the liability, the status of the parties in the partnership, and the status of the partnership are crucial elements in computing the basis of a partner's interest. In regard to this case, the basis of Mrs. Laney's partnership interest in Hollister Hempstead, Ltd. is important since section 704(d) limits the amount of a partner's distributive share of partnership loss to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Petitioners have made several arguments in an effort to sustain their right to deduct the partnership losses claimed on their 1971 and 1972 Federal income tax returns with respect to the Hollister Hempstead, Ltd. partnership.For the sake of simplicity we shall deal with each one separately. Petitioners first contend that a general partnership between themselves, the Corporation and two other individuals was formed in early 1971 to develop the apartment complex. In this partnership petitioners contend that they owned a 50 percent interest in profits and losses. Accordingly, they assert that 50 percent of the partnership liabilities, recourse or otherwise, should be allocated to their partnership basis. Unfortunately for petitioners, we cannot agree that a general partnership was formed in early 1971. No credible evidence of an oral partnership has been introduced. It is clear, however, that a corporation was formed in early 1971 in which the petitioner and two other individuals were shareholders. This corporation purchased the land for development and secured the necessary financing for construction development in its own name. The petitioner played an active role as a corporate officer in obtaining the necessary credit commitments, engaging contractors, and indemnifying the corporate guarantor from loss on any potential loan foreclosure. We note that in 1971 and 1972 the petitioner deducted the expenditures he incurred with respect to the Hollister project as his costs of doing business and did not in any manner treat such expenditures as contributions to a partnership. In addition, petitioner's theory directly conflicts with the documentary evidence submitted. First, every loan application and agreement expressly states that the corporation was the owner of the land and that it was to be liable on the loans incurred. Second, no documentary evidence exists of any partnership agreement between the corporation and petitioners in early 1971. Third, the real property was transferred to a limited partnership on November 8, 1971, and not to a general partnership. Finally, the only written evidence of a partnership in existence in 1971 and early 1972 was the Hollister Hempstead, Ltd. partnership in which Mrs. Laney was a limited partner. In this regard the petitioners' 1971 and 1972 tax returns clearly denominate the Hollister Hempstead partnership as a limited partnership. Under the limited partnership the wife and a 50 percent profits interest. Thus, in the absence of any written evidence supporting petitioner's theory and much written evidence suggesting otherwise, we conclude that no general partnership was created by the petitioners in 1971 and 1972. Petitioner's second argument is that the limited partnership allegedly formed on November 8, 1971 could not be a limited partnership because it did not adequately comply with the requirements of Texas law for the formation of a limited partnership.[3] Thus the petitioners contend that the partnership created was not a limited one. Respondent, on the other hand, maintains that sufficient compliance with Texas law has occurred so as to validate the limited partnership on November 8, 1971. We agree with respondent. Texas law provides, in pertinent part, that: Sec. 3. (a) Two (2) or more persons desiring to form a limited partnership shall: (1) Sign and swear to a certificate, which shall state: (A) The name of the partnership. (B) The character of the business. (C) The location of the principal place of business.
(D) The name and place of residence of each member; general and limited partners being respectively designated. (E) The term for which the partnership is to exist. (F) The amount of cash and a description of the agreed value of the other property contributed by each limited partner. (G) The additional contributions, if any, agreed to be made by each limited partner and the times at which or events on the happening of which they shall *44 be made. (H) The time, if agreed upon, when the contribution of each limited partner is to be returned. (I) The share of the profits or the other compensation by way of income which each limited partner shall receive by reason of his contribution. (J) The right, if given, of a limited partner to substitute an assignee as contributor in his place, and the terms and conditions of the substitution. (K) The right, if given, of the partners to admit additional limited partners. (L) The right, if given, of one or more of the limited partners, as to contributions or as to compensation by way of income, and the nature of such priority. (M) The right, if given, of the remaining general partner or partners to continue the business on the death, retirement or insanity of a general partner. (N) The right, if given, of a limited partner to demand and receive property other than cash in return for his contribution. (2) File for record the certificate in the office of the Secretary of State accompanied by the payment of a filing fee in the amount of Twenty-five Dollars ( $25) made payable to the Secretary of State. (b) A limited partnership is formed if there has been substantial *45 compliance in good faith with the requirements of paragraph (a). [Tex. Stat. Ann. art. 6132(a), sec. 3 (West 1971).] While compliance with the statute is necessary to form a limited partnership, the statute specifically provides that substantial compliance in good faith will be sufficient. In this situation the parties executed the limited partnership agreement on November 8, 1971 and filed the document on January 25, 1972. Although neither party has cited, and we hve not found, any case usnder Texas law which has previously determined if a two-month hiatus in filing the certificate constitutes substantial compliance, we think the tenor of other decisions in Texas with respect to limited partnership formation provides a strong basis for so holding. See, e.g. Voudouris v. Walter E. Heller & Co., 560 S.W.2d 202 (Tex. Civ. App. 1977). See also Tiburon National Bank v. Wagner,265 Cal.2d 868; 71 Cal. Rptr. 832 (1968). Accordingly, we conclude that a limited partnership was validly formed on November 8, 1971. Petitioner next argues that *46 if Mrs. Laney was a limited partner in Hollister Hempstead Ltd., then he was a limited partner by virtue of the community property laws of Texas. He further urges us to find that the scope of his activities in promoting the Hollister development and in indemnifying certain stockholder guaranties of corporate indebtedness converts his limited partnership interest into a general interest. [4]
This argument is unpersuasive. The legal effect of the community property laws of Texas on the wife's limited partnership interest is as follows: The spouse may have a one-half right in the wife's profit interests in the partnership but has no community property interest in the right of management or its specific partnership property. Tex. Part. Code Ann. Tit. 17, Art. 6132b, § 28-A (Vernon). Notwithstanding the husband's potential right to one-half of the profits, the wife is legally the only limited *47 partner. Thus, there is no foundation for petitioner's contention that he became a limited partner by virtue of his wife being a limited partner. The fact that the petitioner was active in the Hollister development is irrelevant with respect to this issue. As we have indicated earlier, his actions in the development of this project were as an officer of the corporate general partner and in his individual capacity as a land developer. Any expenditures he incurred during the development were deducted byhim as hiscosts of doing business as a land developer and financier without any regard to his erroneous notion that he was a general partner. Having concluded that only Mrs. Laney was a limited partner in Hollister Hempstead, Ltd. and that the limited partnership was validly formed, we must determine the nature of the partnership liabilities in order to compute the correct basis of Mrs. Laney's limited partnership interest. We note that she contributed $1,000 in cash in 1971 to the partnership, and had no obligation to make any further contribution. In the absence of any allocation of the partnership liabilities to her interest she would be limited to a deduction *48 of her distributive share of partnership losses not in excess of the $1,000. Section 704(d). Here the corporation, in its own name and not in a capacity as general partner, secured the necessary financing for the purchase and development of the apartment complex. One of the shareholders guaranteed the corporate indebtedness and the petitioner indemnified him against any loss on that shareholder's guaranty. In November 1971, the corporation transferred the properties, subject to the outstanding indebtedness, to the newly formed limited partnership in which the corporation was the general partner. We think the partnership liabilities in issue here are recourse liabilities. The regulations define a nonrecourse partnership liability as any liability in which neither the partnership or any of the partners has assumed personal liability. Section 1-752.1(e), Income Tax Regs. Although the corporation took out the loans at a time when it was not a member of a partnership, its personal liability on the loans did not end when the property, subject to such loans, was transferred to the partnership. *49 As partner, it was still personally liable on the loans. Thus, one of the partners had personal laibility on the indebtedness. It would be incongruous to make a distinction between a person who in his capacity as a partner assumes personal liabislity for certain property indebtedness and a person who is personally liable on certain property indebtedness ans subsequently transfers that property, subject to such indebtedness, to a partnership in which the person is a partner. There is no apparent economic difference in the relation of the person to the indebtedness in either situation. See 1 Willis, Partnership Taxation, Sec. 22.01-08 (2 ed. 1976). See also Kingbay v. Commissioner, 46 T.C. 147 (1964). Accordingly, we conclude that the partnership liabislities are recourse liabilities and that Mrs. Laney's basis in her limited partnership interest is limited only to her cash contribution. Issue 2: Termination Loss
On petitioners' 1973 Federal income tax return they claimed a loss in the amount of $44,034 from the termination of Mrs. Laney's partenrship interest in Hollister, Ltd. Respondent disallowed $21,100 of the loss on the ground that the K-1 Schedule *50 issued by the partnership to Mrs. Laney in 1973 indicated that her termination basis, as a result of a distribution of $21,100 prior to the termination, was only $22,934. Petitioners now contend that they never received any distribution from the partnership in the amount of $21,100 prior to termination and that the K-1 Schedule is incorrect. Notwithstanding, we think that petitioners have failed to demonstrate that they did not receive the distribution. They had the opportunity to correct the alleged improper Schedule K-1 in 1973 but took no action regarding it. Moreover, petitioners adduced no financial or accosunting records of the partnership which would support their position. In the absence of any supporting evidence we hold that Schedule K-1 is correct. Accordingly, Mrs. Laney's loss on the termination of the Hollister Ltd. partnership in 1973 is $22,934. Issue 3: Depreciation of Sugar Hill Apartment Complex, Store Buildings and Warehouse
To ascertain the amount of depreciation deductible under section 167 we must determine the useful life of the asset and the date the *51 asset was placed in service. Section 1.167(a)-10, Income Tax Regs. The regulations provide that the estimated useful life of an asset is not necessarily the useful life inherent in the asset but it is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of income. Section 1.167(a)-1(b), Income Tax Regs. The regulations list number of factors to be considered in determining useful life, including: (1) wear and tear and decay or decline from natural causes (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business (3) the climate and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. With respect to the Sugar Hill complex, the questions of useful life and "in service" date are at issue. Petitioners contend the buildings and appliances (including air conditioners) used in the apartments should be given a useful life of 20 years and 5 years, respectively. To the *52 contrary, the respondent contends that a useful life of 30 years for the buildings, 10 years for the appliances and 8 years for the air conditioners are appropriate. The petitioner testified at length as to the overall poor quality of construction of the apartments. He stated that the apartment complex and its appliances would rapidly deteriorate because of the transient nature of its tenants. Moreover, he predicted that within 20 years it would be difficult to rent the apartments because newer units would be built nearby and people would not want to rent at Sugar Hill. Finally, petitioner testified that the continued use of the real property as an apartment complex would not be likely since the commercial center of Houston has moved westward. Although respondent in his trial memorandum indicated that he would call an expert to testify about the useful life of the apartment complex and its appliances, he chose to stand on the burden of proof. In view of petitioner's credible testimony as to the nature of the materials used in constructing the complex, the inferior grade of appliances placed in the apartments, the apartment rental business in the Houston area, the continued *53 growth of the commercial center of Houston into the proximity of Sugar Hill, and petitioner's years of experience as a builder, we agree with his choice of useful lives for the apartment complex and its appliances. With respect to the "in service" date at the apartment complex, however, we agree with respondent. Peitioner has offered no credible evidence as to when the apartment buildings, either singularly or in toto, were ready for the production of rental income. His testimony on the issue was vague, inconsistent and unclear as to when the buildings were finished and available for occupancy. Hence we sustain the respondent's determination of the "in-service date". We also sustain the respondent's determination as to the useful lives of the commercial and storage buildings. We do not think that the same factors that justify a lower useful life on the apartment complex and its appliances are applicable here. Petitioner has failed to carry his burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.
Issue 4: Sale of Business Properties
Petitioners have failed to prove that the basis of certain business properties was in excess of $164,029.82. Rule *54 142, Tax Court Rules of Practice and Procedure. Accordingly, we hold that their deductible loss is limited to the excess of their basis over the amount realized. Issue 5: Section 6651(a) Additions to Tax
Section 6651(a) imposes an addition to tax for a taxpayer's failure to file a required return on or before the specified filing date, including extensions. Such additions to tax may be avoided, however, if the taxpayer can show that the failure to file the return was due to reasonable cause and not due to willful neglect. In the instant case the petitioners' accountant obtained extensions for the 1971, 1972 and 1973 tax years. In each year the return was prepared by the accountant and filed by the petitioners subsequent to the extension expiration date. Petitioners contend that their failure to file the returns on time stems from their reliance on the accountant to properly prepare the return. In this regard they maintain that the accountant informed them that, since no tax liability would be owing for each year in issue, timely filing was not necessary. Their accountant *55 testified that due to the complicated nature of the returns he was unable to prepare them within the extension period. Although he testified that he believed no tax was owing, he did not state that he had advised petitioners that no return was necessary or that it was acceptable to file late. In view of these facts, we conclude that the petitioners are liable for the section 6651(a) additions to tax. They are charged with the primary responsibility to see that their returns are timely filed. Section 6012. They cannot avoid this responsibility by shifting it to their accountant. An accountant is merely the agent of the taxpayer. Elliot v. Commissioner, 40 T.C. 304 (1963); see also Custom Component Switches, Inc. v. United States, 396 F.2d 514 (9th Cir. 1968); Logan Lumber Co. v. Commissioner, 365 F.2d 846 (5th Cir. 1966). Petitioners' reliance on Burton Swartz Land Corp. v. Commissioner, 198 F.2d 558 (5th Cir. 1952) is misplaced. In that case the Court of Appeals held that reliance by a corporate taxapayer on its accountant as to whether it was a personal holding company constituted reasonable cause for *56 its failure to file a personal holding company return. In Burton the absence of any belief that the taxpayer was a personal holding company obviated the need for any return to be filed. Here, by contrast, there was never any question as to whether a return was due, and it is apparent from the record that both petitioners and their accountant knew a return was due. Accordingly, we find that there was no reasonable cause for the untimely filing of petitioners' Federal income tax returns for 1971, 1972 and 1973. Therefore, respondent's imposition of the section 6651(a) additions to tax is sustained. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect for the years in issue, unless otherwise indicated.↩
2. The purchase and the sale of the real estate were reported on Schedule C of petitioners' 1971 income tax return.↩
3. If we were to accept petitioner's argument that a general partnership was formed in November 1971, then for purposes of computing the 1971 partnership loss allocated to petitioners the nature of the liabilities in issue would be irrelevant. As stated earlier, if the partnership is a limited one and petitioners are limited partners, then the nature of the liability becomes critical in determing theri bases in the interest.↩
4. As discussed above, if the petitioner is a general partner, then his basis in the partnership is increased by the allocable share of partnership liabilities (recourse or otherwise).↩