MORTEX MANUFACTURING CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mortex Mfg. Co. v. Commissioner
Docket Nos. 9423-91, 11279-91
United States Tax Court
T.C. Memo 1994-110; 1994 Tax Ct. Memo LEXIS 111; 67 T.C.M. (CCH) 2412; March 21, 1994, Filed *111 Decision will be entered under Rule 155. For petitioner: Susan M. Freund and Steven Russo. For respondent: Susan E. Seabrook. SHIELDS
SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these consolidated cases, respondent determined deficiencies in petitioner's income tax for its fiscal years ending on March 31, 1987, 1988, and 1989, in the respective amounts of $ 5,698, $ 262,617, and $ 129,252. After concessions, [1] the only issue for decision is whether petitioner, Mortex Manufacturing Co., Inc. (Mortex), is entitled to claim deductions, for fiscal years 1988 and 1989, under section 162(a)(1) [2] *112 for the full amounts paid to its officers as compensation. [3] Petitioner argues in the alternative that, if a portion of the payments made to the officers is found to be unreasonable compensation for services rendered, then the disallowed amounts are properly deductible for the use by petitioner of certain patents and a trade secret owned by one or more of the officers. FINDINGS OF FACT Petitioner, an Arizona corporation with its principal place of business at Tucson, was organized in 1976 by Max W. Deason (Max), his wife, Jo Elsie Deason (Jo), and their children Ted Deason (Ted), Ann Deason (Ann), and Bart Deason (Bart) to carry on a business which Max with Jo's help had founded and developed over a period of years as a sole proprietorship. The business consists of the manufacture and distribution of products used in the construction of swimming pools. Max, an inventor and entrepreneur, was the moving force behind the business both before and after its incorporation until his death in 1987. However, all other members of the family were closely involved in the business from its inception. Jo was responsible for its finances, and all of the children worked in the business *113 when they were students and later when they were shareholders of the corporation. Ann subsequently married Donald Poyas (Don), who began to work for the business in 1970. Ted's wife Carlene Deason (Carlene) became a vice president of the corporation in 1988. [4]
Upon its incorporation, 200,000 shares of Mortex's common stock were issued at $ 1 per share as follows: Max Deason
62,000 shares
Jo Deason
60,000 shares
Ann Deason
26,000 shares
Ted Deason
26,000 shares
Bart Deason
26,000 shares
By March 31, 1981, the stock ownership was as follows: Max Deason
118,998 shares
Jo Deason
2 shares
Ann Deason Poyas
40,500 shares
Ted Deason
40,500 shares
*114 In April 1981, Ted and Ann purchased their father's shares in petitioner, and thereafter through the fiscal years in question petitioner's stock was held as follows: Ted Deason
99,999 shares
Ann Deason Poyas
99,999 shares
Jo Deason
2 shares
The total payments made to its officers [5] as compensation by petitioner for fiscal years 1988 and 1989 were as follows: Name
Title 1988 1989 Ted Deason
President
$ 315,080
$ 242,080
Carlene Deason
Vice president
46,000
68,000
Ann Deason Poyas
Secretary
201,700
160,200
Donald Poyas
Vice president
201,700
160,200
Jo Deason
Treasurer
156,280
122,280
TOTAL
920,760
752,760
Of the total of $ 920,760 paid by petitioner to its officers in fiscal year 1988, $ 505,760 was paid during the year as salaries and deducted as such on petitioner's return for 1988. The balance of $ 415,000 was paid by petitioner at the end of the year and deducted as commissions. Of the $ 752,760 paid by petitioner *115 to its officers in fiscal year 1989, $ 572,760 was paid during the year as salaries and deducted as such on petitioner's return for 1989. The balance of $ 180,000 was paid by petitioner at the end of the year and deducted as commissions. In the deficiency notice respondent did not make a separate determination with respect to the reasonableness of the compensation paid to each officer. Instead respondent determined that total reasonable compensation for the officers in 1988 and 1989 was $ 272,440 and $ 335,000, respectively, and disallowed the balance of the salaries and all of the commissions deducted by petitioner. Under petitioner's bylaws, each officer is required to reimburse petitioner for any amount paid to such officer as compensation but ultimately disallowed as a deduction by respondent. In the years prior to the incorporation of Mortex, Max, assisted by Jo and Ted, developed a formula for a product used in finishing concrete structures. The product, known as Keystone Kool Deck (Kool Deck), is a chemical additive which creates a colorful nonskid surface when mixed with cement and certain other chemicals including dyes and applied to the wet surface of concrete structures *116 such as swimming pool decks. The use of the Kool Deck additive also reduces the temperature of a concrete surface to which it is applied by up to as much as 35 percent compared to a concrete surface that has not been similarly treated. When Mortex was incorporated in 1976, the formula for Kool Deck was not transferred to the corporation. Instead, knowledge of the formula was retained at that time by Max, Jo, and Ted. During the years under consideration the formula was known only to Ted, Jo, Ann, and Don. Since its development the formula, as well as the manner and order in which its components are added to the mixture, have been zealously guarded by the family, whose knowledgeable members regard it as a trade secret which they provide as part of their services to petitioner. The formula for Kool Deck has never been patented because of the disclosures which would have to be made in a patent application and the certainty that the trade secret would enter the public domain when the patent expires. [6]
*117 A family member who knows the secret of Kool Deck must be present when the product is prepared. Usually, Ted mixes the chemical constituents of Kool Deck, but Don and Ann are capable of doing so. Even though she knows the formula, Jo is probably not capable of mixing the necessary chemicals because of her age and physical limitations. One trusted employee mixes the colors and does some mixing of chemicals, but the employee does not know the trade secret of Kool Deck. This trusted employee as well as all other nonofficer employees of Mortex are required to sign an Employee Confidentiality Agreement in which they agree to not reveal any knowledge of petitioner's operation or its products acquired in the course of their employment. Kool Deck and other products of Mortex are sold throughout the United States and in 25 or 26 foreign countries. No one else manufactures a product similar to Kool Deck although over the years a number of people have attempted to do so without success. Their failure is apparently due to the fact that, while a chemical analysis of Kool Deck will reveal its chemical ingredients, it will not disclose the form or condition of the ingredients when they are *118 added to the mixture or the order in which they are added. Max acquired during his life and held at his death a patent covering forms for use in the construction of free-form pools, a patent for forms for use in the construction of concrete expansion and contraction joints, a patent for the construction of an apparatus for forming pool deckings and copings, and a patent for a pool deck drain. Max died intestate on May 5, 1987, and under Arizona law his wife Jo was the sole beneficiary of his estate. There is no formal documentation of a transfer of his patents to Jo. However, at the time of the trial, the products protected by the patents were being manufactured by petitioner with Jo's permission and the Kool Deck formula was still being provided to petitioner by Ted, Don, Ann, and Jo. While Ted, the president of petitioner, was still in high school, he began to assist his father in the family business and continued to do so while attending the University of Arizona, where he earned in 1969 a bachelor of science degree in metallurgical engineering. During the fiscal years in question, Ted developed for petitioner two new products, Marquee, a commercial grade of Kool Deck for *119 use on walkways and driveways of commercial buildings, and the Ad-Tex Sprayer, a device which simplifies the application of some of petitioner's products. With his engineering background, Ted has been able to personally modify almost all of the equipment used by petitioner in the production of the products sold by petitioner. Ted regularly works 80 hours each week of which 5 percent or less is devoted to Tucson Foam and Equipment, Inc. (Tucson Foam), a related entity described hereinafter. Petitioner's plant operates around the clock Monday through Saturday. Ted is at the plant for startup at 4:30 on each Monday morning and is always on call throughout the week including Sunday. Because of his broad knowledge of the business and of the contribution made by each of the individuals involved, Ted is primarily responsible for setting the levels of compensation for each officer of petitioner. However, the compensation of each officer is considered at a meeting of petitioner's officers, who are also its directors, which is usually held at or near the end of each fiscal year. During each of these meetings, petitioner's net sales are estimated for the year and 30 percent of the estimated *120 net sales is considered the total of all compensation to be paid by petitioner to its officers for the year. After a discussion during which each officer has an opportunity to state his or her opinion of the value of each officer's contribution to the corporation during the preceding year, an agreement is reached with regard to the share of each officer in the total compensation for the year. The excess of such agreed amount for each officer over the total amount of his or her salary for the year is then paid to the officer as a yearend bonus or commission. Ted, with assistance from Don, is also responsible for the compensation of each of petitioner's 8 to 11 plant workers; and with assistance from Jo, he is responsible for the compensation paid to petitioner's 3 or 4 office employees. [7]
*121 Don, a vice president of petitioner, is a professional photographer. In addition, he has received professional training in computers and business administration. He established and is responsible for petitioner's computer system. However, purchasing is his primary responsibility for petitioner. He is also responsible for having established a cost-reducing system whereby trucks delivering products for petitioner are loaded upon return with petitioner's supplies. He too is on call for petitioner 24 hours a day and fills in for absent employees, as well as for Ted when Ted is not available. Don usually works 80 hours in a week which includes his supervision of the plant operations at Tucson Foam. Ten percent or less of his time is devoted to Tucson Foam and the balance to petitioner. Ann, the secretary of petitioner, is primarily in charge of its sales and marketing. Like her brother Ted, she is thoroughly familiar with petitioner's business since she began working with her father while she was still in high school. She negotiates prices with major customers and has established an "early buy" program whereby customers place orders in the fall for products they will need the *122 following summer. With Ann's excellent planning, petitioner is able to ship orders on the day they are placed. Her marketing efforts include attendance at all national and regional conventions where petitioner's products are exhibited. With her knowledge of all aspects of petitioner's business, she is able at such conventions to explain petitioner's products, handle technical questions, and advise contractors and other interested parties in the use of petitioner's products. Ann is also an experienced artist, and her husband, as stated above, is a professional photographer. Working together after regular hours and often into the mornings in an office [8] in their home, they frequently develop for petitioner advertising brochures and instructional videotapes. Ann also helps Jo supervise petitioner's bookkeeping and insurance coverage. In addition during the *123 years in question she was training Carlene in bookkeeping, foreign sales, and export documentation. Jo, petitioner's treasurer, is also thoroughly familiar with petitioner's operation because she helped Max start the business and has been closely associated with it from the beginning. She is primarily responsible for petitioner's banking and other financial affairs including the negotiation of certain letters of credit and sales negotiations with established customers. Together with Ann, she also supervises petitioner's bookkeeping and its insurance coverage. As indicated hereinbefore, she assists Ted in determining the levels of compensation paid to petitioner's three or four office employees. At the trial Jo, who is 70 years old, did not testify because she was recovering from a back operation, and the level of her involvement with petitioner appeared to be somewhat less than full time. [9]
*124 As indicated hereinbefore, Carlene, the wife of Ted, has been a vice president of petitioner since 1988. The record, however, fails to establish what her duties for petitioner were prior to becoming a vice president of petitioner in 1988 or the specific duties she performed or was responsible for during fiscal years 1988 and 1989 other than the fact that she was being trained by Ann in bookkeeping, foreign sales, and export documentation. Petitioner uses polystyrene foam board in its manufacture of pool deck forms. Over the years petitioner has had difficulty in finding a dependable source for such board which satisfies petitioner's specifications. Consequently in 1979, Bart Deason formed Tucson Foam Board to manufacture such board for petitioner. The business operated by Bart as Tucson Foam Board was sold in 1986 to Tucson Foam & Equipment, Inc., a separate corporation. One-half of the stock of Tucson Foam is owned by Ted and his wife and the other one-half is owned by Ann and her husband. Its officers are also Ted, Carlene, Ann, and Don, who during the years in question received salaries from Tucson Foam in the following amounts: Name
Title 1988 1989 Ted Deason
President
$ 16,344
$ 17,500
Carlene Deason
Vice president
14,332
27,000
Ann Poyas
Sec/treasurer
12,382
15,500
Donald Poyas
Vice president
18,294
25,000
*125 On July 13, 1988, Ted, Carlene, Don, and Ann organized Deck Directors, Inc., and with it attempted to launch a business to sell to pool contractors a franchise to construct pool decks. The franchise included the use of, but not the formula for, an enhanced version of Kool Deck as well as certain other products manufactured by Mortex and covered by the patents obtained by Max. The venture known as Deck Directors was primarily the responsibility of Ann but it was not successful, since no franchises were sold. Deck Directors was dissolved after filing two nonprofitable income tax returns, one for the period from July 13, 1988, to March 31, 1989, and the other for the period from April 1, 1989, to December 31, 1989. During its short existence, Ann spent less than 5 percent of her time tending to Deck Directors' affairs. During 1988 and 1989 Ann and Don owned some show horses which were held for breeding purposes. The horses were not stabled at or near the residence of Ann and Don but at the Star B Farm where they were being trained by Star Bennett. Neither Ann, Don, nor any other member of their family ever rode the horses or participated in their training or spent any appreciable *126 amount of time during the period in question in the training or upkeep of the horses. After Christmas in 1988, Ann initiated a business called Signed, Sealed, and Remembered. The business which had one employee was begun in Ann's home, but about a month later in late January of 1989 the business and its one employee moved to a small office on Oracle Road in Tucson, Arizona. The business consisted of the sale or lease of a computer program designed in a few hours by Ann for the purpose of helping people to organize their time in order to attend to important matters which are often neglected, such as business and personal appointments and the recognition of birthdays, anniversaries, and holidays. During 1989 Ann devoted about 1 or 2 hours each month to the affairs of Signed, Sealed, and Remembered. For 1988 she reported on her joint return with Don no income and a loss of $ 9,677 from Signed, Sealed, and Remembered. On their joint return for 1989, she reported gross receipts of $ 33,146 and a net loss of $ 56,775. The record does not reflect the amount of time, if any, which Don devoted to the business. During 1989 Jo was responsible for an outlet for Signed, Sealed, and Remembered *127 located in Las Vegas, from which she reported gross receipts of $ 10,235 and a net loss of $ 30,938. The record does not disclose the amount of time which Jo devoted to this operation. From its incorporation petitioner has been in excellent financial condition. It has a high rating with Dunn and Bradstreet, and its bad debt ratio is less than 1 percent. Petitioner's liquidity as measured by standard ratios is excellent. Its officers and directors have a longstanding policy against outside borrowing. Over the years, expansion and other capital needs of petitioner have been financed with retained earnings or advances from stockholders. In the years in question, $ 400,000 was invested by petitioner in its plant and equipment. In March shortly before the end of its fiscal year 1989 petitioner borrowed $ 210,000 from its shareholders because of a cash shortage. The loan was repaid within 6 months. Petitioner does not have a pension or a deferred compensation plan. It did not pay any dividends between April 1, 1985, and March 31, 1989. Its initial capitalization in 1976 was $ 200,000 or $ 1 per share of its stock. By the end of its fiscal year 1989, petitioner's book value *128 was $ 704,000, and its appraised value was conservatively estimated at $ 1,851,166. For the years 1985 through 1989, petitioner's income and deductions can be summarized as follows: 1985
1986
1987
1988
1989
Net sales
$ 2,994,258
$ 2,937,024
$ 2,737,140
$ 3,152,784
$ 2,816,410
Less cost of sales
1,129,187
1,025,783
977,797
1,247,660
1,786,302[1]
1,865,071
1,911,241
1,759,343
1,905,124
1,030,108
Other income
61,053
40,052
34,343
45,206
30,833
Total income
1,926,124
1,951,293
1,793,686
1,950,330
1,060,941
Less total expenses
1,909,877
1,914,470
1,748,851
1,879,148
1,096,586
Profit/loss
16,247
36,823
44,835
71,182
(35,645)
Comparable figures are not in the record for years prior to 1985. However, net sales and officers' compensation are in the record for the years 1978 through 1989. They are as follows: 1978
1979
1980
1981
Net sales
$ 1,280,047
$ 1,554,835
$ 1,926,558
$ 1,801,091
Officers' salaries
282,000
428,200
456,000
456,000
Officers' bonuses
171,000
50,000
92,000
75,000
Total officers' comp.
453,000
478,200
548,000
531,000
*129 1982
1983
1984
1985
Net sales
$ 2,190,316
$ 2,216,123
$ 2,883,401
$ 2,994,258
Officers' salaries
478,000
480,000
516,000
624,000
Officers' bonuses
132,000
300,000
367,000
515,000
Total officers' comp.
610,000
780,000
883,000
1,139,000
1986
1987
1988
1989
Net sales
$ 2,937,024
$ 2,737,261
$ 3,152,784
$ 2,816,410
Officers' salaries
676,690
681,480
564,320
572,760
Officers' bonuses
430,000
300,000
400,000
180,000
Total officers' comp.
1,106,690
981,480
964,320
752,760
As a percentage of net sales, total compensation paid by petitioner to its stockholder-officers for each of the years 1978 through 1989 was 35 percent, 31 percent, 28 percent, 30 percent 28 percent, 35 percent, 31 percent, 38 percent, 38 percent, 36 percent, 31 percent, [10] and 27 percent, respectively, for an average annual percentage during this period of 32 percent. [11]
*130 Expert witnesses for the parties offered contradictory testimony concerning the reasonableness of the total compensation paid to petitioner's officers. However, respondent's expert, Emmett J. Brennan III, a compensation consultant, did not question the valuation of $ 1,851,166 placed on Mortex as of March 31, 1989, by petitioner's expert, Walter Pocock, a business valuation specialist. Mr. Pocock summarized his valuation of Mortex as follows: Adjusted net worth
$   932,666
Real estate
918,500
TOTAL
1,851,166
The adjusted net worth used by Mr. Pocock included petitioner's machinery and equipment at $ 775,450, its cost less depreciation. Mr. Pocock noted that this was a conservative valuation, because it made no upward adjustment for the substantial modifications made to the equipment by Ted or for its excellent condition due to its careful maintenance under Ted's supervision. Mr. Pocock also found that on the basis of book value before any adjustment petitioner's net worth had increased over 800 percent between 1977 and 1989; i.e., from $ 67,000 to $ 704,000. He also noted that between petitioner's incorporation in 1976 with an initial capitalization of $ 200,000 *131 and the end of its fiscal year 1989, its net worth increased by 350 percent; that during the same period its value increased from $ 200,000 to $ 1,851,166 or by over 900 percent; and that during the 2 years in issue, its net worth as reflected on its balance sheet increased by 4.8 percent as follows: Year
Assets Liabilities Net Worth
1989
$ 1,020,582
$ 316,501
$ 704,081
1987
669,366
(951)
670,317
Difference
33,764
Mr. Pocock also noted, that of petitioner's $ 316,501 in debt at the end of fiscal year 1989, $ 210,000 was represented by a loan from its shareholder-officers. The note was repaid by petitioner within 6 months. Petitioner's expert testified that he had chosen the highest salaries he could find as appropriate for its officers, in view of its excellent performance. He noted that its officers work together as an effective team and have a substantial amount of cross-training which permits them to do each other's jobs. As a result, petitioner has been able to consistently generate sales in the range of $ 3 million per year with only 8 to 11 plant employees and only 3 or 4 office employees. He also noted that such an accomplishment can be attained *132 with only 11 to 15 nonofficer employees by very few manufacturing companies. He was unable to find an appropriate ceiling for the compensation paid by petitioner to its officers because in his opinion "the company would disintegrate without them." His conclusions, which are not restricted to companies with comparable sales or number of nonstockholder-employees, are based generally on the PAS Executive Compensation Survey of contractors and the National Institute of Business Management survey of companies manufacturing concrete products. Respondent's expert concluded that petitioner's officers received compensation which was "extraordinarily higher" than officers of firms that he concluded were comparable. In reaching his conclusion, he surveyed published data from various sources [12] on companies manufacturing concrete products with the same level of sales as petitioner's 1988 sales of $ 3.15 million and 1989 sales of $ 2.82 million. [13] The following table summarizes his conclusions with respect to salaries paid by corporations which he found to be comparable to petitioner; i.e., companies manufacturing concrete products with sales similar in amount to those of petitioner. For *133 the position held by each of petitioner's officers the table lists the maximum average compensation and maximum compensation. 1988
1989
Name/Title
Average Maximum Average Maximum T. Deason,
$ 101,160
$ 192,810
$ 102,440
$ 192,070
president
C. Deason,
18,200
29,200
28,840
31,520
asst. treas.
J. Deason,
51,020
79,700
44,010
74,450
treasurer
A. Poyas,
53,680
96,400
65,220
88,620
secy.
D. Poyas,
45,750
64,690
36,370
56,850
asst. secy.
TOTAL
269,810
462,800
276,880
443,510
*134 In arriving at his conclusion, respondent's expert incorrectly assumed that Carlene devoted only 50 percent of her time and Ann only 80 percent of her time to Mortex. Furthermore, when he compiled his data, respondent's expert did not know or take into consideration the exact nature and extent of the duties of petitioner's officers or the value of the Kool Deck formula which was made available to petitioner through the services of Ted, Ann, Don, and Jo or the value of the patents originally obtained by Max and made available to petitioner by Jo after Max's death. Furthermore, he did not know whether the occupants of similar corporate positions with companies which he found to be comparable to petitioner made any such formulas, patents, or other items of value available to their employers. OPINION The resolution of the dispute involved in this case depends upon whether the amounts paid by petitioner to its officers constitute reasonable compensation within the meaning of section 162(a)(1), which provides: SEC. 162(a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade *135 or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered.
The test of deductibility under section 162(a)(1) is whether the payments are (1) reasonable in amount and (2) are in fact payments made for services. Sec. 1.162-7(a), Income Tax Regs. Ostensible salaries may be dividends when paid to the shareholders of a closely held corporation which has paid no dividends. Sec. 1.162-7(b)(1), Income Tax Regs. In general, respondent's regulations take the position that it is just to assume that reasonable compensation does not exceed the amount which would ordinarily be paid for like services by like enterprises under like circumstances. Sec. 1.162-7(b)(3), Income Tax Regs.Section 1.162-8, Income Tax Regs., reads as follows: Treatment of excessive compensation. -- The income tax liability of the recipient in respect of an amount ostensibly paid to him as compensation, but not allowed to be deducted as such by the payor, will depend upon the circumstances of each case. Thus, in the case of excessive payments by corporations, if such payments correspond or bear a close relationship to stockholders, *136 and are found to be a distribution of earnings or profits, the excessive payments will be treated as a dividend. * * *
Respondent's determination in this case that a substantial portion of the payments in question was dividends is presumed to be correct, and petitioner bears the burden of proving it to be erroneous. Rule 142(a); Botany Worsted Mills v. United States, 278 U.S. 282 (1929). The leading case on the question before us by the Court of Appeals for the Ninth Circuit, to which our decision is appealable, is Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. In Elliotts the following factors are listed as determining whether compensation paid by a corporation to its officer-stockholders is reasonable: (a) The character and condition of the corporation; (b) the officer-stockholders' roles in the corporation; (c) the existence of internal consistency in the establishment of compensation for the officer-stockholders; (d) a comparison of the officer-stockholders' salaries with those paid to similar employees, by similar companies, *137 for similar services; and (e) indications of conflicts of interest in the establishment of compensation levels. Similar factors have been considered by this Court on many occasions. E.g., Modernage Developers, Inc. v. Commissioner, T.C. Memo. 1993-591; Nelson Brothers, Inc. v. Commissioner, T.C. Memo. 1992-726. At the outset it is noted that in Elliotts, the Court of Appeals rejected the rule that the failure to pay dividends is of itself indicative of a distribution of disguised dividends; i.e., the automatic dividend rule of Charles McCandless Tile Service v. United States, 191 Ct. Cl. 108, 422 F.2d 1336 (1970). See also Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326-1327 (5th Cir. 1987), affg. T.C. Memo. 1985-267, where the Court of Appeals also rejected the McCandless rule as follows: We reject the so-called automatic dividend rule -- under which even reasonable compensation to shareholder-employees is automatically deemed to include disguised dividends if the corporation has been profitable *138 and has not paid dividends. We conclude, however, that the absence of dividend payments by a profitable corporation that has offered no specific reason for its failure to pay dividends is one of the factors a court may consider when addressing the reasonableness of compensation paid by that corporation to its shareholder-employees. A corporation's dividend practices should not, however, be viewed in a vacuum. An investor may garner a return on his investment through either dividends or appreciation in the value of his stock. For reasons acceptable under the tax code, many investors prefer stock appreciation over dividends. And indeed, many corporations with publicly traded stock pay no dividends. Therefore, the court should look not only at a corporation's dividend practices, but also at the total return the corporation is earning for its investors, its shareholders. [Citing Elliotts Inc. v. Commissioner, 716 F.2d at 1246-1247.] The prime indicator of the return a corporation is earning for its investors is its return on equity.
In the case before us, as in Elliotts and Owensby, we focus on the issue of the reasonableness of the compensation *139 paid to petitioner's officers. Elliotts, Inc. v. Commissioner, supra at 1245. Therefore, in this case we must apply each of the factors set forth in Elliotts to the facts in the record before us. 1. The Character and Condition of the Corporation
The character and condition of the corporation in this case are strong and clearly indicate that its officers have done an excellent job from its incorporation through the years under consideration and deserve to be reasonably compensated for its success. By the standard measures of solvency, i.e., current ratio and quick ratio, petitioner's financial position is highly liquid even though petitioner incurred a relatively small loss for 1989. The loss is explained, however, in part by a decline in sales, and in part by a change during the year to a more accurate system of accounting for cost of goods sold. Petitioner also experienced a cash shortage in 1989, but its officers lent petitioner $ 210,000 rather than borrow from outsiders or abandon their formula for determining the amount of their total compensation. The loan was repaid in less than 6 months. 2. Role of Officer-shareholders
*140 We turn now to the role of each of the officers in the company. Ted is clearly the key employee. He has the technical knowledge to develop new products and the know-how and technical ability to modify petitioner's machinery and to supervise its manufacturing operations. It is clear that since the death of Max, Ted has been primarily responsible for the development of new products for petitioner as well as for the modification and care of its equipment which accounts to a substantial degree for the high productivity achieved in petitioner's manufacturing operations. He is the family member who knows and most often uses knowledge of Kool Deck's secret formula to complete a key phase of its production. His dedication to petitioner's service is great; he is on call 24 hours a day and puts in an 80-hour week, and even the relatively small amount of his time which is devoted to the affairs of Tucson Foam indirectly benefits petitioner. He is the one employee of petitioner who is irreplaceable. Ann and Don bring diverse talents to bear on their jobs. They both know and are capable of using the formula for Kool Deck. In addition Don is in charge of purchasing, and is responsible *141 for petitioner's computer system. He is trained in business administration, a fact which accounts for his ability to cut costs and streamline petitioner's operations. The joint in-house production of advertising materials by Ann and Don and their capacity, with Ted and Jo, to perform other people's jobs are obviously important factors in petitioner's ability to operate efficiently and profitably with such a small staff of other employees. We are satisfied that it would be difficult to find other officers who could handle the amount and variety of work done by Ann, Don, and Ted. Replacing them might involve hiring an entire management team. Don, like Ted, puts in extraordinarily long hours and is on call 24 hours a day. Here again the relatively small amount of his time which is devoted to other affairs does not decrease his value to petitioner. In fact, the time devoted by him to the affairs of Tucson Foam is directly beneficial to petitioner. We do not agree with respondent's expert that Ann devotes only 80 percent of her time to petitioner. Like the other members of the family, she puts in very long hours for petitioner. Furthermore the additional activities she pursued *142 during 1988 and 1989 do not appear to have detracted from her service to petitioner; and in the case of Tucson Foam these activities were of benefit to petitioner. She effectively handles petitioner's sales and, by reason of her long association with petitioner and knowledge of its affairs, she was beginning to take over some of Jo's responsibilities during 1988 and 1989. Jo has been actively involved in the business operated by petitioner since such business was founded as a sole proprietorship by Max several years prior to petitioner's incorporation. Therefore, even though she was unable to appear at the trial and the record contains evidence that she is over 70 years of age, is suffering from some ill health, and may be at least partially retired with Ann taking over some of her duties, it is apparent from the record as a whole: (1) That Jo is a very capable person and extremely knowledgeable of petitioner's business; (2) that during 1988 and 1989 she participated in many if not all of the major managerial decisions made for petitioner; (3) that her participation in such decisions was of considerable value to petitioner; and (4) that as part owner of the formula for Kool Deck *143 and as the owner of Max's patents, she consented to the use by petitioner of these valuable assets. We are also satisfied that her age and the reduction, if any, in her day-to-day participation in the corporate affairs of petitioner during its fiscal years 1988 and 1989 are more than offset by the knowledge and experience she has gained from her years of service to the corporation. See Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694 (1977). Furthermore, somewhat higher compensation than might normally be expected can be reasonable where as here such compensation is paid to an aged employee of long service by a corporate employer like Mortex which has no fringe benefits such as a pension plan. See Kennedy v. Commissioner, 671 F.2d 167, 175, (6th Cir. 1982), revg. 72 T.C. 793 (1979). Carlene was admittedly new to the business in the years in question and was being trained in bookkeeping and export documentation by Ann. However, we are unable to agree with the conclusion of respondent's expert that she was a part-time employee. Nevertheless, the record does fail to include facts to document *144 Carlene's exact duties. Consequently, we are not persuaded that during 1988 and 1989 she was actually serving in an executive capacity. We conclude, therefore, that her salary was excessive for a new employee who was still in training. In summary on this point, we find that, with the exception of Carlene, all of petitioner's officers have over the years done an extraordinarily good job and deserve to be well compensated, especially in view of the fact that their combined knowledge, skills, long hours, and hard work have enabled petitioner to consistently conduct an unusually large volume of business with a relatively small staff. The extreme dedication and devotion demonstrated in this case by Ted, Jo, Ann, and Don to the successful business affairs of petitioner not only during the years under consideration but for several years prior thereto is something which an independent investor would take into consideration in arriving at a reasonable compensation for them. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246. 3. Internal Consistency in the Establishment of Compensation
A third factor to be considered in determining the reasonableness *145 of compensation levels is the existence or the lack of internal consistency in the establishment of the compensation including bonuses [14] paid to stockholder-officers. "Bonuses that have not been awarded under a structured, formal, consistently applied program generally are suspect. * * * On the other hand, evidence of a reasonable, longstanding, consistently applied compensation plan is evidence that the compensation paid in the years in question was reasonable." Id. at 1247. For the purpose of determining whether such a formula existed in this case, we have considered figures for years prior to the years in question, since "The reasonableness of a longstanding formula should not be determined on the basis of *146 just one or two years." Id. at 1248. The record contains evidence from which we find that petitioner had a longstanding plan that the total compensation for its officer-stockholders was to be approximately 30 percent of its net sales. As set forth in our findings, such compensation paid by petitioner to its officers during the 12 years ending with fiscal 1989 ranged from a low of 27 percent in 1989 to a high of 38 percent in 1985 and 1986 of net sales for an average of 32 percent. This finding supports a conclusion that such a plan was in existence, especially in view of the fact that petitioner's net sales could not be accurately projected and had to be estimated at the time the commission or bonus portion of the compensation was paid. 4. Comparison of the Total Compensation Paid by Petitioner to Its Officer-stockholders With Salaries Paid by Other Employers to Similar Employees for Similar Services
The fourth factor to be considered is a comparison of the compensation paid by petitioner to its officer-stockholders with compensation paid by similar companies for similar services. Id. at 1246; sec. 1.162-7(b)(3), *147 Income Tax Regs. Petitioner's expert readily admitted that he was unable to find a company with officers having the ability to generate the success demonstrated by petitioner with a similar number of nonofficer employees. Consequently on this issue, the only detailed evidence in the record was provided by respondent's expert. However, respondent's expert based his conclusions upon an analysis of firms manufacturing concrete products which had a similar volume of sales. From such analysis he concluded that the compensation received by petitioner's officers was unreasonable, since their compensation was significantly higher than compensation received by individuals holding similar positions in the upper quartile of such firms. We, however, are not convinced from the record before us that the firms chosen by respondent's expert constitute employers with officers who provided services of the quality and volume provided by petitioner's officers. This is apparent from his description of the services provided to petitioner by Ted, Jo, Ann, and Don. His description of their services is far from accurate since it tends to limit the services provided by petitioner's officers to those *148 provided by the occupants of the usual corporate offices with similar titles rather than the extraordinary services provided by these individuals. From the record before us, we are also unable to agree with the conclusions of respondent's expert that Ann was a less than full-time employee or that Jo was essentially retired. With regard to the trade secret represented by the formula for Kool Deck, respondent's expert on cross-examination conceded that in the preparation of his report he was under the erroneous impression that knowledge of the Kool Deck formula was not limited to Ted, Jo, Ann, and Don, but was also known by at least the one trusted employee referred to in our findings. Therefore, the expert concluded that since the trusted employee admittedly did not receive any additional compensation from petitioner for her knowledge of the formula, the officers were not entitled to any additional compensation for their knowledge. The expert also conceded that the actual holders of such knowledge were entitled to rewards for keeping it secret so that it was available only to petitioner. With regard to the patents obtained by Max during his life, but owned and made available to *149 petitioner by Jo during the years under consideration, respondent's expert apparently concluded as contended by respondent's counsel that, if the payments made to Jo represented consideration for the use of the patents, such payments are not deductible because they did not constitute "compensation for personal services actually rendered." We do not agree. Such payments may still be deductible because they were paid for a short-term benefit, inasmuch as Jo was free at any time to withhold her patents. See T.J. Enterprises, Inc. v. Commissioner, 101 T.C.     (1993). 5. Indications of Conflicts of Interest in the Establishment of Compensation
Finally we consider factors which may indicate conflicts of interest in the establishment of compensation levels. Where officer-shareholders who are in control of a corporation set their own compensation, careful scrutiny is required to determine whether the alleged compensation is not in fact at least in part a distribution of profits. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Logan Lumber Co. v. Commissioner, 365 F.2d 846, 851 (5th Cir. 1966), *150 affg. on this issue T.C. Memo. 1964-126; Home Interiors & Gifts v. Commissioner, 73 T.C. 1142, 1156 (1980). The Court of Appeals in Elliots, Inc. v. Commissioner, 716 F.2d at 1247, evaluated the reasonableness of compensation payments paid to corporate officers from the perspective of a hypothetical independent shareholder as follows: If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Fn. ref. omitted.]
In the case before us respondent contends that petitioner has failed to demonstrate that a hypothetical independent *151 shareholder would be satisfied with the return on an investment in petitioner during the years in question. In support of this contention, respondent points out that petitioner's expert report focused upon the value of the corporation at the end of fiscal year 1989 rather than upon its growth, that petitioner's balance sheet indicates a growth of only a modest 4.8 percent during the years under consideration, and that petitioner's own expert concluded that petitioner had no goodwill. Under these circumstances, respondent contends that an independent shareholder would not be willing to forgo dividends from petitioner while a significant portion of its earnings were paid out as salaries and commissions to its officer-shareholders. See Home Interiors and Gifts v. Commissioner, supra.
Respondent further contends that petitioner fails to satisfy the independent investor standard set out and discussed in Elliotts, Inc. v. Commissioner, supra, because petitioner's value as a going concern is dependent upon (1) continued access to the trade secret represented by the Kool Deck formula, as well as to the patents obtained *152 by Max and owned by Jo, since petitioner admittedly has no legal right to use the formula or the patents in its manufacturing operations; and (2) continued access to Ted's special services and to a lesser extent the special services of Ann and Don, since petitioner has no contractual right to such services. Respondent contends that the loss of any one or all of these services would seriously decrease or even wipe out petitioner's value as a going concern and leave nothing but the equipment and real estate for an independent investor. To the contrary, in our view, while respondent's argument is well made, it arrives at an incorrect conclusion. Petitioner admittedly has no right of access to the Kool Deck formula, which is known only to Ted, Ann, Don, and Jo, or to the patents, which are the property of Jo. Therefore, the exclusive provision of these items as well as the special services of Ted, Don, and Ann represent a substantial part, if not all, of the reason for petitioner's success and for the increase over the years in petitioner's value from $ 200,000 in 1976 to a conservative appraisal in 1989 of $ 1,851,166, an increase of over 900 percent or an average annual increase *153 during the period of 69.2 percent. Such an increase in the value of his investment in the stock of a corporation would undoubtedly impress an independent investor whether or not he received dividends. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1326; Elliotts, Inc. v. Commissioner, 716 F.2d at 1247 n.6. Therefore, under the circumstances, and using our best judgment after weighing the conflicting interests involved, we conclude that, with the exception of the compensation paid to Carlene, the compensation paid by petitioner to its officers during 1988 and 1989 is reasonable and petitioner is entitled to the deductions claimed for such compensation. However, from the record before us we are unable to conclude that Carlene assumed the full responsibilities of a corporate officer during the years under consideration. Therefore, after taking into consideration the salaries paid by petitioner to nonofficer employees and the salary paid to Carlene by Tucson Foam during the same years, we find that reasonable compensation for the services rendered to petitioner by Carlene during 1988 and 1989 was $ 20,000 and *154 $ 25,000, respectively. Decisions will be entered under Rule 155. Footnotes
1. The concessions concern the characterization of various amounts as capital expenses or ordinary deductions.↩
2. All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. The resolution of this issue will determine the amount of a net operating loss which petitioner is entitled to carry back from fiscal year 1989 to fiscal year 1986 and the amount of investment tax credit which petitioner is entitled to carry forward from fiscal year 1986 to fiscal year 1987.↩
4. As indicated hereinafter, Bart in 1979 formed Tucson Foam Board, a separate company, for the manufacture of foam board for petitioner, but during the tax years under consideration Bart was no longer a stockholder or employee of petitioner. During such years Ted and Ann with their spouses owned all of the stock in Tucson Foam & Equipment, Inc., the successor to Tucson Foam Board.↩
5. The officers are also the directors of petitioner.↩
6. The name "Keystone Kool Deck" and the phrase "The Original Keystone Kool Deck Mortex and Co." are registered trademarks which were obtained by Max and assigned to Mortex in 1985.↩
7. During fiscal years 1987, 1988, and 1989, petitioner had 11 full-time nonofficer employees. During 1987 these employees were paid salaries from a low of $ 13,382 to a high of $ 27,168. Each such employee received a bonus which ranged from a low of 13.4 percent to a high of 25.8 percent of the employee's salary. During 1988 petitioner's nonofficer employees were paid salaries ranging from a low of $ 13,272 to a high of $ 27,168. Each employee received a bonus from a low of 15.2 percent to a high of 26.9 percent of the employee's salary. During 1989 petitioner's 11 nonofficer employees received salaries from a low of $ 16,332 to a high of $ 30,305. Each received a bonus from 8.3 percent to 29.7 percent of the employee's salary. It is apparent, therefore, and we so find, that during the years under consideration petitioner had an established history of paying a base salary plus an annual bonus in a substantial amount to each of its nonofficer employees.↩
8. The home office contains a complete facility for producing brochures and videotapes including computers, laser printers, light tables, and other equipment.↩
9. The record contains an application by Jo dated June 26, 1987, for split-dollar insurance, which includes a statement that she was retired, and in a letter to the IRS Jo stated that at that time she was reachable at home during the day. On brief respondent contends that these facts support a finding that Jo was fully retired during the years at issue. However, such a finding is not supported by the record as a whole.↩
1. The disproportionate increase in cost of sales for 1989 stems from the fact that for 1985 through 1988 only purchases and freight were included in cost of sales, while for 1989 labor, depreciation, and certain other costs were included.↩
10. In his report petitioner's expert uses 34 percent for 1988, which is an apparent error.↩
11. Over the years an attempt has been made by the officers and directors to keep their total compensation to approximately 30 percent of petitioner's net sales, but variations occur because the amount of the commissions has to be determined and paid before net sales can be finally determined.↩
12. Sources used included surveys by Robert Morris Associates and Ernst & Young and reports by Wyatt Executive Compensation Service and Conference Board Top Executive Compensation.↩
13. We are not persuaded by respondent's contention that the Stegmeier Corp. is a comparable business because the record clearly indicates that this is a less profitable competitor of petitioner whose principal, William J. Stegmeier, formerly worked for Max Deason and whose product is not comparable in quality to petitioner's Kool Deck.↩
14. That amount of the compensation paid by petitioner to each of its officers in excess of salaries was shown as "commissions" on petitioner's returns in schedules headed "Other Deductions". However, at trial and on brief both parties referred to such amounts as "bonuses".↩